

1  LIUZZI, MURPHY & SOLOMON, LLP
2  Martin D. Murphy (SBN 164669)
   Michael E. Hale (SBN 245378)
3  101 Montgomery St., 27th Floor
   San Francisco, CA, 94104
4  T: (415) 543-5050
   F: (415) 543-3550
5
6  COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
   Shirley Hochhausen (SBN 145619)
7  2117(b) University Avenue
   East Palo Alto, CA 94303
8  T: (650) 326-6440
9  Attorneys for Plaintiff

10             UNITED STATES DISTRICT COURT

11    NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

12  RICARDO MARCELOS,
13                    Plaintiff,          ) Case No.
                                          ) CV 08 0056
14          v.                            ) MEMORANDUM OF POINTS AND
                                          ) AUTHORITIES IN SUPPORT OF
15  EDWIN MAURICIO PARADA DOMINGUEZ,      ) PLAINTIFF'S *EX PARTE* MOTION FOR
16  GLENDA PARADA, LORENZO PARADA, VIK    ) A TEMPORARY RESTRAINING
    RAAB, COUNTRYWIDE HOME LOANS,         ) ORDER AND ORDER TO SHOW CAUSE
17  ARGENT MORTGAGE COMPANY, LLC,         ) REGARDING PRELIMINARY
    PRIMESTAR FINANCIAL SERVICES, SHOAIB  ) INJUNCTION
18  MAHMUD, FINANCIAL TITLE COMPANY,      )
19  NEW CENTURY TITLE COMPANY,            )
    RECONTRUST COMPANY, N.A.              )
20                                        )
21  AND DOES 1 through 100,               )
                                          )
                    Defendants.           )
22                                        )
23                                        )
                                          )
24  _____      )

25
26
27
28

MEMORANDUM OF POINTS

# TABLE OF CONTENTS

I.    INTRODUCTION    ...........................................................................1

II.   STATEMENT OF FACTS    ................................................................2

III.  ARGUMENT.........................................................................…..... 4

   A.   Mr. Marcelos Seeks And Is Entitled To A Narrowly Tailored TRO and
        Preliminary Injunction …. ........................................................... 4

   B.   The Legal Standard  ...........................................................…..... 4

   C.   Mr. Marcelos Is Likely To Succeed In Proving His Claims ..................`..... 5

        1.    Mr. Marcelos will likely succeed in proving his fraud claim ...…...... 5

        2.    Mr. Marcelos will likely succeed in proving his TILA claim........... 6

              a.TILA Violation Number 1: ....................................... 7

              b.TILA Violation Number 2: ………… …….....................…..... 7

        3.    Mr. Marcelos will likely succeed in proving his § 1632 claim......... 8

        4.    Mr. Marcelos will likely succeed in proving his § 17200 claim....... 9

   D.   **The Threatened Foreclosure of Mr. Marcelos Home Constitutes Irreparable**
        Harm and the Balance of Hardships Favors Mr. Marcelos. ............9

   E.   **Public Interest Favors Granting Injunctive Relief to Prevent**
        **Foreclosure** ...................................................................... 10

IV.  **CONCLUSION** ................................................................……....11

ii

1

# TABLE OF AUTHORITIES

2

## Cases

3 *Children's Television, Inc. v. General Foods Corp.*,
35 Cal. 3d 197 (1983) ............................................................................................... 9

4

*Cole v. Lovett*,
5 672 F. Supp. 947 (S.D. Miss. 1987) ......................................................................... 8

6 *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*,
774 F.2d 1371 (9th Cir. 1985) .................................................................................. 5

7

*First Brands Corp. v. Fred Meyer, Inc.*,
8 809 F.2d 1378 (9th Cir. 1987) .................................................................................. 5

9 *Gilder v. PGA Tour, Inc.*,
936 F.2d 417 (9th Cir. 1991) .................................................................................... 6

10

*Girard v. Bell*,
11 125 Cal App. 3d 772 (1981) ..................................................................................... 6

12 *Mount v. LaSalle Bank*,
926 F. Supp 759 (N.D. Ill. 1996) .............................................................................. 2

13

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS*,
14 743 F.2d 1365 (9th Cir. 1984) .................................................................................. 5

15 *Sammartano v. First Judicial Dist. Ct., in & for County of Carson City*,
303 F.3d 959 (9th Cir. 2002) .................................................................................. 10

16

*Stone v. Mehlberg*,
17 728 F. Supp. 1341 (W.D. Mich. 1989) ................................................................. 2, 8

18 *Sundance Land Corp. v. Community First Federal Savings and Loan Association*,
840 F.2d 653 (9th Cir. 1988) .................................................................................. 10

19

*Underwood v. American Home Mortgage Co.*,
20 66 B.R. 656 (Bankr. W.D. Va. 1986) ...................................................................... 8

21

*Washington v. Indiana High School Athletics Ass'n, Inc.*,
22 181 F.3d 840 (7th Cir. 1999) .................................................................................... 6

23

## Statutes

24 15 U.S.C. § 1601 ....................................................................................................... 6

25 15 U.S.C. § 1635 ....................................................................................................... 7

26 15 U.S.C. § 1635(c) .................................................................................................. 7

27 15 U.S.C § 1639(h) ................................................................................................... 8

28

MEMORANDUM OF POINTS AND AUTHORITIES

15 U.S.C. § 1640(a)(3) ................................................................................................ 7

Cal. Bus. & Prof. Code § 17200 ..........................................................................2, 5, 8

Cal. Civil Code 3345 ................................................................................................... 8

Cal. Civil Code 1632 ................................................................................................... 8

12 C.F.R. § 226.23(b)(1) ............................................................................................. 7

MEMORANDUM OF POINTS AND AUTHORITIES

1

INTRODUCTION

2      Plaintiff Ricardo Marcellos, a married father of two moves this Court for a temporary restraining

3 order and preliminary injunction to restrain defendants Recontrust Company, N.A. (hereinafter

4 "Recontrust") and Countrywide home loans (hereinafter "Countrywide") from foreclosing on his San

5 Francisco home where he and his family now live. The foreclosure sale is scheduled for January 7, 2008

6 at 2pm.

7      The loan which is the subject of this action was made by Argent Mortgage Company, LLC

8 ("Argent") through one of its cooperating mortgage brokers, Shoaib Mahmud and Primestar Financial

9 Services, with Edwin Parada (hereinafter "Parada") acting as the agent. Escrow was handled by New

10 Title Insurance Company (hereinafter "New Title"). The loan was subsequently sold to Countrywide

11 Mortgage ("Countrywide") who has noticed the foreclosure through the trustee of the grant deed,

12 Recontrust. The foreclosure sale is scheduled for January 7, 2008 at 2pm.

13      The subject loan violates the "Truth in Lending Act (hereinafter "TILA") in that material

14 disclosures were withheld from the consumer. Mr. Marcelos did not timely receive two properly filled

15 out copies of the "Notice of Right to Cancel" as required by TILA. In fact, he did not receive any

16 documents at the time of signing. In these circumstances the consumer retains the right to rescind for

17 up to a period of three years. When the consumer rescinds the loan, as Mr. Marcelos has here, TILA

18 provides that the security interest in the loan is canceled. As the security interest underlies the right to

19 foreclose, cancellation of the security interest also cancels the right to foreclose. Mr. Marcelos

20 exercised this right on December 31, 2008 by delivering a notice of rescission to Countrywide's legal

21 department via overnight express USPS mail.

22      Mr. Marcelos is entitled to injunctive relief because the equities are strongly in his favor. Mr.

23 Marcelos likely will succeed on his claims because Argent and its successor-in-interest Countrywide

24 violated the Truth in Lending Act by failing to provide critical consumer disclosures, violated California

25 law when as mortgage brokers they negotiated the subject loan in Spanish and failed to provide Spanish

26 language translations and operated a bait and switch when they misrepresented the terms of the

27 transaction and then stole $200,000 in proceeds from the refinance of the Plaintiff's property. If

28

1

Defendant Countrywide is permitted to foreclose, Mr. Marcelos and his family will suffer irreparable harm by being wrongly uprooted from their home. On the other hand, Countrywide will experience no hardship if they are prohibited from presently carrying out the foreclosure, as the real property is insured, and has a value that is more than sufficient to compensate Countrywide should the sale eventually take place.

In addition to fraud and violations of TILA, the broker, lender and title company committed fraud and violated the Real Estate Settlement Procedures Act ("RESPA") Section 8, by, among other wrongs, charging for services they did not perform. The defendants also committed unfair trade practices pursuant to California Business and Professions Code section 17200, as further detailed herein. The subject loan was rescinded by letter dated December 31, 2007 and sent to Countrywide home Loans, the present owner of the loan[1]. For all of these reasons and for the reasons more fully stated below, Mr. Marcelos. respectfully requests that his Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction be granted.[2]

## I.    STATEMENT OF FACTS

Mr. Marcelos lives at 4023 Folsom Street San Francisco California (The Home), with his children and wife. He earns approximately $4,700 per month, $57,000 annually, an income derived from his job as a Roofer. (Marcelos Decl. at pg. 1, ¶2).

Mr. Marcelos was visited in 2005 by a Realtor and Loan Broker named Edwin Parada who wanted to interest him in buying a bigger home. This initial conversation ,as well as every other conversation regarding the subject financing of The Home, was conducted entirely in the Spanish language.

Mr. Marcelos repeatedly told Mr. Parada that he was not interested in a bigger house and that he did not wish to incur additional debt (Marcelos Decl. at pg. 2, ¶3). Nonetheless, Parada continued to

---

[1] The rescission remedy runs against any assignee: "Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation." 15 U.S.C. Sec. 1641 (c), *Mount v. LaSalle Bank, Lakeview* 926F. Supp.759 (N.D. Ill. 1996); *Stone v. Mehlberg*, 728 F. Supp. 1341 (W.D. Mich. 1989). Failure to deliver the required three day notice is imputable to Wells Fargo, the owner of the loan and Gateway, the assignee. Ms. Nevis will prove other violations of law including violations of the RESPA and Elder Abuse which are not unique, but are a part of a pattern and practice of discriminatory and predatory lending against the disadvantaged members of the senior community .For purposes of this motion, however, these arguments are reserved.

visit Marcelos at his home on Folsom Street all times of the day and night trying to persuade him to access the equity in the Folsom property in order to buy a bigger house. (Marcelos Decl. at pg. 2, ¶4). In the course of their conversations, Parada suggested that it might be problematic the Marcelos children, a boy and a girl, were still sharing a room. (Marcelos Decl. at pg. 2, ¶4).

In time Mr. Marcelos was worn down and agreed to allow Parada to obtain a line of credit on the Home in order to permit Mr. Marcelos to buy a bigger house.

Mr. Parada represented to Mr. Marcelos that he would obtain a line of credit on The Home, that the monthly mortgage payments would go up by about $100 per month and The Home would yield enough equity to purchase a bigger home. Based on Mr. Parada's representations, Mr. Marcelos agreed to allow Parada to find such a line of credit. (Marcelos Decl. at pg. 2, ¶5).

On May 27, 2005, Mr. Parada called to say the papers were ready and asked Mr. Marcelos to meet him at a Starbucks Coffee shop in Hayward, CA. When Mr. Marcelos arrived, he found not Edwin Parada but Lorenzo Parada, Edwin's brother, and a notary (Marcelos Decl. at pg. 2, ¶¶7 and 8).  Lorenzo stepped out of the coffee shop leaving Mr. Parada with the notary who showed Mr. Marcelos where he was to sign the papers. When he had questions, the notary directed him to ask Lorenzo Parada who in turn told Mr. Marcelos that his brother Edwin Parada would answer all questions when he got back from an extended trip (Marcelos Decl. at pg. 3, ¶9). Relying on Lorenzo and Edwin Parada, Mr. Marcelos signed papers he thought would provide him with an equity line of credit (Marcelos Decl. at pg. 3, ¶9). After Mr. Marcelo had signed the papers, Lorenzo Marcelos collected them and told Mr. Marcelos that they would provide him with copies of the signed papers at a later time. Mr. Marcelos left the "closing" without a single document. (Marcelos Decl. at pg. 3, ¶10).

When Mr. Marcelos received a payment demand from Argent that was $3,200.00 per month rather than the usual $2,600.00, he grew alarmed. (Marcelos Decl. at pg. 3, ¶14). But the worst was yet to come; Mr. Marcelos eventually learned that Edwin Parada had stolen $200,000.00 cash in the course of the transaction. Looking at the figures, it is clear that this loan was not designed to benefit Mr. Marcelos and not designed to be repaid but rather to generate fees and create the opportunity to steal money from the equity, all of which would result in the foreclosure of Mr. Marcelos' home.

3

1    Mr. Marcelos was so concerned about the fraud and theft that he reported the matter to both the

2    San Francisco Police Department and the Office of the San Francisco District Attorney.  Mr. Marcelos

3    found that he was not alone in being victimized by Mr. Parada and Argent. Others who had done

4    business with Parada came forward and told similar stories of Bait and Switch and theft and Argent

5    was exposed as a predatory lender and on September 6, 2005 voluntarily entered into a Cease and

6    Desist Order agreeing among other things to enhance its broker approval process to bar unscrupulous

7    brokers from selling Argent's loans and prohibiting the type of disbursements that allowed Parada to

8    steal $200,000. (Report attached as ***Exhibit 1***).

9    On December 31, 2007, written notice of rescission of the subject loan has been provided to

10   Countrywide. (Hale Decl at pg. 2, ¶3).  Notwithstanding written notice of rescission of the subject loan,

11   Countrywide has been unresponsive to Mr. Marcelos' rescission and his request that the foreclosure sale,

12   presently scheduled for January 7, 2008, be canceled based on rescission of the loan and their resulting

13   cancellation of the underlying security interest in the property.

14

15   **II.    ARGUMENT**

16   **A.     Mr. Marcelos Seeks and Is Entitled To A Narrowly-Tailored TRO and
            Preliminary Injunction**
17

18   Mr. Marcelos seeks a narrowly-tailored TRO and preliminary injunction enjoining the owners of

19   the loan, Countrywide and the agents for Countrywide from foreclosing on his home pending the

20   resolution of this case.

21   **B.     The Legal Standard**

22   In the Ninth Circuit, an applicant for preliminary injunctive relief must demonstrate: (1) a

23   likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) that the balance of

24   hardships favors the applicant; and (4) whether any public interest favors granting an injunction. *See*

25   *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.,* 774 F.2d 1371, 1374 (9th Cir. 1985).

26   Alternatively, the applicant must demonstrate either: a combination of probable success on the merits

27   and the possibility of irreparable injury, or, serious questions going to the merits and that the balance of

28

4

1

INTRODUCTION

2      Plaintiff Ricardo Marcellos, a married father of two moves this Court for a temporary restraining

3   order and preliminary injunction to restrain defendants Recontrust Company, N.A. (hereinafter

4   "Recontrust") and Countrywide home loans (hereinafter "Countrywide") from foreclosing on his San

5   Francisco home where he and his family now live.  The foreclosure sale is scheduled for January 7, 2008

6   at 2pm.

7      The loan which is the subject of this action was made by Argent Mortgage Company, LLC

8   ("Argent") through one of its cooperating mortgage brokers, Shoaib Mahmud and Primestar Financial

9   Services, with Edwin Parada (hereinafter "Parada") acting as the agent.  Escrow was handled by New

10  Title Insurance Company (hereinafter "New Title").  The loan was subsequently sold to Countrywide

11  Mortgage ("Countrywide") who has noticed the foreclosure through the trustee of the grant deed,

12  Recontrust.  The foreclosure sale is scheduled for January 7, 2008 at 2pm.

13     The subject loan violates the "Truth in Lending Act (hereinafter "TILA") in that material

14  disclosures were withheld from the consumer.  Mr. Marcelos did not timely receive two properly filled

15  out copies of the "Notice of Right to Cancel" as required by TILA.  In fact, he did not receive any

16  documents at the time of signing.  In these circumstances the consumer retains the right to rescind for

17  up to a period of three years.  When the consumer rescinds the loan, as Mr. Marcelos has here, TILA

18  provides that the security interest in the loan is canceled.  As the security interest underlies the right to

19  foreclose, cancellation of the security interest also cancels the right to foreclose.  Mr. Marcelos

20  exercised this right on December 31, 2008 by delivering a notice of rescission to Countrywide's legal

21  department via overnight express USPS mail.

22     Mr. Marcelos is entitled to injunctive relief because the equities are strongly in his favor. Mr.

23  Marcelos likely will succeed on his claims because Argent and its successor-in-interest Countrywide

24  violated the Truth in Lending Act by failing to provide critical consumer disclosures, violated California

25  law when as mortgage brokers they negotiated the subject loan in Spanish and failed to provide Spanish

26  language translations and operated a bait and switch when they misrepresented the terms of the

27  transaction and then stole $200,000 in proceeds from the refinance of the Plaintiff's property.  If

28

1

1   Defendant Countrywide is permitted to foreclose, Mr. Marcelos and his family will suffer irreparable

2   harm by being wrongly uprooted from their home.  On the other hand, Countrywide will experience no

3   hardship if they are prohibited from presently carrying out the foreclosure, as the real property is

4   insured, and has a value that is more than sufficient to compensate Countrywide should the sale

5   eventually take place.

6       In addition to fraud and violations of TILA, the broker, lender and title company committed

7   fraud and violated the Real Estate Settlement Procedures Act ("RESPA") Section 8, by, among other

8   wrongs, charging for services they did not perform.  The defendants also committed unfair trade

9   practices pursuant to California Business and Professions Code section 17200, as further detailed herein.

10  The subject loan was rescinded by letter dated December 31, 2007 and sent to Countrywide home

11  Loans, the present owner of the loan[1]. For all of these reasons and for the reasons more fully stated

12  below, Mr. Marcelos. respectfully requests that his Application for Temporary Restraining Order and

13  Order to Show Cause Regarding Preliminary Injunction be granted.[2]

14  **I.    STATEMENT OF FACTS**

15      Mr. Marcelos lives at 4023 Folsom Street San Francisco California (The Home), with

16  his children and wife.  He earns approximately $4,700 per month, $57,000 annually, an

17  income derived from his job as a Roofer. (Marcelos Decl. at pg. 1, ¶2).

18      Mr. Marcelos was visited in 2005 by a Realtor and Loan Broker named Edwin Parada who

19  wanted to interest him in buying a bigger home.  This initial conversation ,as well as every other

20  conversation regarding the subject financing of The Home, was conducted entirely in the Spanish

21  language.

22      Mr. Marcelos repeatedly told Mr. Parada that he was not interested in a bigger house and that he

23  did not wish to incur additional debt (Marcelos Decl. at pg. 2, ¶3).  Nonetheless, Parada continued to

---

[1] The rescission remedy runs against any assignee: "Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation." 15 U.S.C. Sec. 1641 (c), *Mount v. LaSalle Bank, Lakeview* 926F. Supp.759 (N.D. Ill. 1996); *Stone v. Mehlberg,* 728 F. Supp. 1341 (W.D. Mich. 1989). Failure to deliver the required three day notice is imputable to Wells Fargo, the owner of the loan and Gateway, the assignee. Ms. Nevis will prove other violations of law including violations of the RESPA and Elder Abuse which are not unique, but are a part of a pattern and practice of discriminatory and predatory lending against the disadvantaged members of the senior community .For purposes of this motion, however, these arguments are reserved.

2

visit Marcelos at his home on Folsom Street all times of the day and night trying to persuade him to access the equity in the Folsom property in order to buy a bigger house. (Marcelos Decl. at pg. 2, ¶4). In the course of their conversations, Parada suggested that it might be problematic the Marcelos children, a boy and a girl, were still sharing a room. (Marcelos Decl. at pg. 2, ¶4).

In time Mr. Marcelos was worn down and agreed to allow Parada to obtain a line of credit on the Home in order to permit Mr. Marcelos to buy a bigger house.

Mr. Parada represented to Mr. Marcelos that he would obtain a line of credit on The Home, that the monthly mortgage payments would go up by about $100 per month and The Home would yield enough equity to purchase a bigger home.  Based on Mr. Parada's representations, Mr. Marcelos agreed to allow Parada to find such a line of credit. (Marcelos Decl. at pg. 2, ¶5).

On May 27, 2005, Mr. Parada called to say the papers were ready and asked Mr. Marcelos to meet him at a Starbucks Coffee shop in Hayward, CA. When Mr. Marcelos arrived, he found not Edwin Parada but Lorenzo Parada, Edwin's brother, and a notary (Marcelos Decl. at pg. 2, ¶¶7 and 8).  Lorenzo stepped out of the coffee shop leaving Mr. Parada with the notary who showed Mr. Marcelos where he was to sign the papers. When he had questions, the notary directed him to ask Lorenzo Parada who in turn told Mr. Marcelos that his brother Edwin Parada would answer all questions when he got back from an extended trip (Marcelos Decl. at pg. 3, ¶9).  Relying on Lorenzo and Edwin Parada, Mr. Marcelos signed papers he thought would provide him with an equity line of credit (Marcelos Decl. at pg. 3, ¶9). After Mr. Marcelo had signed the papers, Lorenzo Marcelos collected them and told Mr. Marcelos that they would provide him with copies of the signed papers at a later time.  Mr. Marcelos left the "closing" without a single document. (Marcelos Decl. at pg. 3, ¶10).

When Mr. Marcelos received a payment demand from Argent that was $3,200.00 per month rather than the usual $2,600.00, he grew alarmed. (Marcelos Decl. at pg. 3, ¶14).  But the worst was yet to come; Mr. Marcelos eventually learned that Edwin Parada had stolen $200,000.00 cash in the course of the transaction. Looking at the figures, it is clear that this loan was not designed to benefit Mr. Marcelos and not designed to be repaid but rather to generate fees and create the opportunity to steal money from the equity, all of which would result in the foreclosure of Mr. Marcelos' home.

1    Mr. Marcelos was so concerned about the fraud and theft that he reported the matter to both the

2    San Francisco Police Department and the Office of the San Francisco District Attorney. Mr. Marcelos

3    found that he was not alone in being victimized by Mr. Parada and Argent. Others who had done

4    business with Parada came forward and told similar stories of Bait and Switch and theft and Argent

5    was exposed as a predatory lender and on September 6, 2005 voluntarily entered into a Cease and

6    Desist Order agreeing among other things to enhance its broker approval process to bar unscrupulous

7    brokers from selling Argent's loans and prohibiting the type of disbursements that allowed Parada to

8    steal $200,000. (Report attached as *Exhibit 1*).

9    On December 31, 2007, written notice of rescission of the subject loan has been provided to

10   Countrywide. (Hale Decl at pg. 2, ¶3). Notwithstanding written notice of rescission of the subject loan,

11   Countrywide has been unresponsive to Mr. Marcelos' rescission and his request that the foreclosure sale,

12   presently scheduled for January 7, 2008, be canceled based on rescission of the loan and their resulting

13   cancellation of the underlying security interest in the property.

15   **II.    ARGUMENT**

16   **A.    Mr. Marcelos Seeks and Is Entitled To A Narrowly-Tailored TRO and**
17   **Preliminary Injunction**

18   Mr. Marcelos seeks a narrowly-tailored TRO and preliminary injunction enjoining the owners of

19   the loan, Countrywide and the agents for Countrywide from foreclosing on his home pending the

20   resolution of this case.

21   **B.    The Legal Standard**

22   In the Ninth Circuit, an applicant for preliminary injunctive relief must demonstrate: (1) a

23   likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) that the balance of

24   hardships favors the applicant; and (4) whether any public interest favors granting an injunction. *See*

25   *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.,* 774 F.2d 1371, 1374 (9th Cir. 1985).

26   Alternatively, the applicant must demonstrate either: a combination of probable success on the merits

27   and the possibility of irreparable injury, or serious questions going to the merits and that the balance of

28

4

hardship tips sharply in the applicant's favor. *See First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir. 1987). These two tests are not inconsistent. Rather, they represent a continuum of equitable discretion, whereby "the greater the relative hardship to the moving party, the less probability of success must be shown." *Nat'l Ctr. for Immigrants Rights, Inc. v. INS,* 743 F.2d 1365, 1369 (9th Cir. 1984). As discussed below, Mr. Marcelos is likely to prevail on his claims and the equities in this case strongly favor the granting of injunctive relief under either test.

### C.    Mr. Marcelos Is Likely To Succeed In Proving His Claims

In order to show likelihood of success on the merits, a plaintiff does not need to prove an overwhelming likelihood of success, but rather a reasonable probability of success. *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir. 1991). A likelihood of success may be found even where there is merely a better than negligible chance of succeeding on the merits. *Washington v. Indiana High School Athletics Ass'n, Inc.,* 181 F.3d 840, 846 (7th Cir. 1999). Given the facts set forth above, Mr. Marcelos has a reasonable probability of success on his fraud claim, his Truth In Lending Act claims, as well as his § 1632 claim for failure to provide required translations and his 17200 claim for unfair business practices. These claims are discussed in detail below.[3]

### 1.    Mr. Marcelos is likely to succeed in proving his fraud claim.

The facts in this case are so egregious and the conduct of Argent and Parada so outrageous that Mr. Marcelos will have no difficulty in meeting all the elements of a fraud claim, which are: 1) misrepresentation, 2) knowledge of falsity, 3) intent to defraud or induced reliance, 4) justifiable reliance, and 5) resulting damage. *See Girard v. Bell,* 125 Cal App. 3d 772, 783 (1981).

Lorenzo and Edwin Parada and their employer, Primestar Financial Services, induced Mr. Marcelos to refinance his home loan by misrepresenting to him that the transaction was a line of credit rather than a refinance, by misrepresenting the loan terms, including, but not limited to, the cost of the loan, monthly payment, closing costs, and other terms and conditions. (Marcelos Decl. at ¶¶4 and 11).

Most of the representations made to Mr. Parada regarding the "loan" turned out to be false. The monthly payments exceeded the old loan by more than $600.00 per month and defendants knew or

---

[3]    Mr. Marcelos is confident that discovery will show that he can also prevail on his RESPA claims, as well as the other claims in his complaint.

5

should have known that Mr. Parada could never make the monthly payments which increased to $5,739.95 in July 2006 of when they knew his income was only $57,000 per year, or $4,750.00 per month.

Mr. Marcelos is employed as a Roofer, he is financially unsophisticated and was compelled to sign English language documents when the entire course of negotiations had been conducted in Spanish. He reasonably relied on the brokers and lenders who empowered and aided them to guide him through the application and loan process as they were her brokers, financial advisors and fiduciaries.

Mr. Marcelos has been damaged by Argents' conduct in aiding and abetting Mr. Parada in committing fraud and damaged by Argents' statutory failure to deliver two copies of a properly executed "NOTICE OF RIGHT TO CANCEL." (Marcelos Decl. at pg. 3,¶10). He has suffered monetary damages due to a loan he understood to be a line of credit and suffered the theft of $200,000.00. (Marcelos Decl. at pg. 2, ¶11). Mr. Marcelos will suffer further injury if Countrywide or their agents are allowed to foreclose on his home. Faced with the evidence in this case, a jury is likely to find for Mr. Marcelos on his fraud claim.

**2.    Mr. Marcelos will likely succeed in proving his TILA claim.**

Argent committed several Truth in Lending Act (hereinafter "TILA") violations, each a sufficient ground for compensatory damages, attorneys' fees and among them, failures, which give rise to the right to rescind the loan. TILA was enacted to "avoid the uninformed use of credit," and to "assure the meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 5 U.S.C. § 1601. TILA is liberally construed and even technical or minor violations impose liability on the creditor. *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1980). Creditors are liable for "a reasonable attorney's fees, as determined by the Court, when borrowers obtain rescission under TILA.

As noted above, failure to provide timely and adequate copies of the "three Day Notice of Right to Cancel" required by TILA gives Mr. Marcelos the right to rescind the loan thereby eliminating the security interest which is the basis for the foreclosure. The fact that the loan has been

6

1    sold to Countrywide does not interfere with cancellation of the security interest and allow the

2    foreclosure to go forward.  See note 1 *supra*.

3        a.    **TILA Violation Number 1:**

4        Argent violated TILA by not providing Mr. Marcelos two accurately filled out copies of the

5    notice of his three day right to rescind the loan at the time of closing.  TILA gives borrowers "the right

6    to rescind the transaction until midnight of the third business day following the consummation of the

7    transaction." 15 U.S.C. § 1635.  In order to give effect to this right, Regulation Z requires that a

8    creditor provide the consumer with two completed copies of a notice of the right to rescind.  12 C.F.R.

9    § 226.23(b)(1).  As described above, the closing on March 29, 2005, which took place at Starbucks

10   Coffee Shop in Hayward, CA, consisted of the notary flipping through the pages and telling Mr.

11   Marcelos to "just sign" a great number of documents.  On these facts alone courts have found TILA

12   violated. *See e.g Underwood v. American Home Mortgage Co.*, 66 B.R. 656 (Bankr. W.D. Va. 1986)

13   (TILA violated where borrowers rushed through signing and signed incomplete forms).

14       In addition, New Century failed to give Mr. Marcelos the requisite two copies of completed

15   notices.  While defendants may produce a document acknowledging receipt of two notices, this

16   production amounts to no more than a rebuttable presumption of delivery of a completed notice. 15

17   U.S.C. § 1635(c).  Numerous courts have held that this presumption can be rebutted by the consumer's

18   testimony that he or she never received the requisite copies, that the closing was rushed and that the

19   right to rescind was not adequately explained. *See e.g. Cole v. Lovett*, 672 F. Supp. 947 (S.D. Miss.

20   1987); *see also Stone v. Mehlberg*, 728 F. Supp. 1341 (W.D. Mich. 1989).  On the strength of a pattern

21   of similar abuse as demonstrated by other known victims in San Francisco and the Cease and Desist

22   Order of the Georgia Department of Banking and Finance citing similar abuses, Mr. Marcelos will

23   prevail on this claim.

24

25       b.    **TILA Violation Number 2:**

26       Argent violated TILA by extending credit to Mr. Marcelos based on falsified income and

27   employment.  By not considering Mr. Marcelos income, current obligations, and employment status to

28   determine whether Mr. Marcelos would actually be able to make the scheduled payments to repay his

7

1  obligations, Argent violated section 1639(h) of TILA, 15 U.S.C. § 1639(h), as implemented by

2  Regulation Z.[4]

3      **3.    Mr. Marcelos will likely succeed in his § 1632 claim.**

4      California Civil Code section 1632 requires that the party negotiating a mortgage provide a

5  translated version of the loan documents in the non-English language in which the loan was

6  negotiated.  Section 1632 applies to all brokered loans but exempts loans

7  secured by real property, though §1632(b)(4) brings the transaction at issue within the purview of the

8  Act.  California Civil Code §1632(b)(4) identifies transactions subject to the Act as,

10          a loan or extension of credit for personal, family or household
11          purposes where the loan or extension of credit is subject to the
           provisions of Article 7 (commencing with § 10240) of Chapter
12          3 of Part 1of Division 4 of the Business and Professions Code,
           or Division 7 (commencing with § 18000, or Division 9
13          (commencing with § 22000 of the Financial Code.

14  The loan at issue here requires lenders to  provide translations when the contract of loan is negotiated

15  in a non-English language such as Spanish, the language of negotiation in this case. (Marcelos Decl. at

16  pg. 2, ¶4).

17      Failure to provide the translation required by §1632 results in the borrowers ability to cancel or

18

19  rescind the subject loan in accordance with §1632(k):

20          Upon a failure to comply with the provisions of this section,
21          the person aggrieved may rescind the contract or agreement
           in the manner provided by this chapter. When the contract for a
22          consumer credit sale or consumer lease which has been sold and
           assigned to a financial institution is rescinded pursuant to this
23          subdivision, the consumer shall make restitution to and have
           restitution made by the person with whom he or she made the
24          contract, and shall give notice of rescission to the
25          assignee. Notwithstanding that the contract was assigned

26  _____

27  [4]      This section of TILA provides extra protections for consumers of "high fee" loans.  It prohibits lenders from
"extending credit without regard to payment ability of consumer," specifically requiring that for high-fee mortgages
creditors should not extend credit "based on the consumers' collateral without regard to the consumers' repayment ability,
28  including the consumers' current and expected income, current obligations, and employment." 15 U.S.C § 1639(h).

without recourse, the assignment shall be deemed rescinded
and the assignor shall promptly repurchase the contract
from the assignee.

This right was exercised by Mr. Marcelos in writing on December 31, 2007. (Hale decl. pg. 2, ¶3).

**4.    Mr. Marcelos will likely succeed in proving his § 17200 claim.**

According to the California Unfair Competition Act ("UCA"), "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  To state a cause of action under the UCA, it is necessary only to show members of the public are likely to be deceived.  *Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 211 (1983).

Argent breached the UCA in numerous ways, including:

1.    Failing to take into consideration Mr. Marcelos ability to repay the loan when they knew or should have known that his income was equal to the monthly loan payments violated TILA and Regulation Z.

2.    Misrepresenting to Mr. Marcelos the terms upon which Argent and their approved brokers were willing to enter into transactions with  him, thereby committing fraud and violating the FHA, ECOA,  TILA and violating Civil Code § 1632 when they negotiated a loan in Spanish and failed to provide Spanish language translations of the loan..

Any one of the deceptive and fraudulent business practices outlined in this brief can, and in fact has, deceived Mr. Marcelos.

**D.  Threatened Foreclosure of Mr. Marcelos' Home Constitutes Irreparable Harm and the Balance of Hardships Favors Mr. Marcelos**

Foreclose on Mr. Marcelos' home constitutes precisely the kind of irreparable harm that can only be prevented by the grant of preliminary injunctive relief. *See Sundance Land Corp. v. Community First Federal Savings and Loan Association*, 840 F.2d 653, 661-662 (9th Cir. 1988) [plaintiff alleged that, in the absence of injunctive relief against foreclosure on property, it would lose the property; held, plaintiff entitled to equitable relief].

9

1    Furthermore, the balance of hardships in this case indisputably favors the granting of injunctive

2    relief. Should the foreclosure be permitted to go forward, Mr. Marcelos and his family will be homeless.

3    On the other hand, there is absolutely no evidence that Argent or their successor in interest Countrywide

4    will be significantly inconvenienced if the foreclosure is delayed.

5

6    **E.    Public Interest Favors Granting Injunctive Relief to Prevent Foreclosure**

7    The news and print media are full of stories about massive numbers of foreclosure based on

8    fraudulent and irresponsible loans made by lenders who pocketed quick profits and left their victims to

9    face foreclosure. The State of Georgia has taken action to stop the lender in this case from continuing to

10   engage in predatory lending practices (Report attached as ***Exhibit 1***). Any foreclosure prior to the

11   resolution of this case on the merits will have a very significant negative impact on the lives of others,

12   particularly minorities and limited English proficient borrowers who have been the victims of similar

13   predatory conduct. Victims of loan swindles such as the one suffered by Mr. Marcelos feel stupid and

14   "taken". They're reluctant to come forward because they think no one will believe them when their

15   testimony is matched against that of an institution like a "bank". If Countrywide and its agents are

16   permitted to violate the Truth in Lending Act and swindle a borrower by negotiating in Spanish and

17   compelling him to sign English language documents in derogation of California law before he can be

18   heard, the message is clear to others who may have considered making a complaint.

19   This is likely to have a chilling effect on minorities and others urging their rights and at the same

20   time send a signal to lenders that they will get away with sharp and fraudulent practices. This impact on

21   non-parties is the issue addressed by the public interest inquiry. *See Sammartano v. First Judicial Dist.*

22   *Ct., in & for County of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002). Considering that Mr. Marcelos

23   is likely to prevail on some or all of his claims, a foreclosure will constitute an unnecessary and

24   unjustifiable trauma in the life of an already injured person.

25   **III.    CONCLUSION**

26   For all of the foregoing reasons, Mr. Marcelos respectfully requests that his Application be

27   granted and that the Court issue:

28

10

1.    An Order to Show Cause why a Preliminary Injunction should not be issued enjoining Countrywide and their officers, agents, servants, employees, assigns and all persons acting in concert with them, or on behalf of them, pending trial of this action from directly or indirectly initiating foreclosure proceedings on a property owned by plaintiff Ricardo Marcelos and located at 4023 Folsom Street, San Francisco CA 94110.

2.    A Temporary Restraining Order enjoining Countrywide and their officers, agents, servants, employees, assigns and all persons acting in concert with them, or on their behalf, pending trial of this action from directly or indirectly initiating foreclosure proceedings on a property owned by plaintiff Ricardo Marcelos and located at 4023 Folsom Street, San Francisco, CA 94110.

DATED: January 4, 2008              Respectfully submitted,


                                    COMMUNITY LEGAL SERVICES IN EAST
                                    PALO ALTO


                                    BY: _Shirley Hochhausen_____
                                       SHIRLEY HOCHHAUSEN
                                       Attorney for Plaintiff Ricardo Marcelos

11

# Skadden

Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates

October 2005

## Consumer Financial Services Enforcement and Litigation Special Mortgage Fraud Update

---

## Inside

Argent Mortgage Company Voluntarily Agrees to Cease and Desist Order Issued by Georgia Department of Banking and Finance............1

FBI's Statistics in Financial Crimes Report Indicate Emerging Trends in Mortgage Fraud............................3

FFIEC Issues White Paper on Third Party Mortgage Loan Fraud............................3

U.S. Attorney for Eastern District of Pennsylvania Enters Joint Agreement with Option One Mortgage Corporation to Help Combat Mortgage Fraud................4

Market Street Mortgage Corporation Enters Settlement Agreement with U.S. Government for Alleged Violations of the False Claims Act...............................6

Consumer Financial Services Enforcement and Litigation Practice Area Description....7

\*    \*    \*

This newsletter is provided by Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates for educational and informational purposes only and is not intended and should not be construed as legal advice. This newsletter may be considered advertising under applicable state laws.

WWW.SKADDEN.COM

---

*This periodic newsletter to our clients and friends is designed to communicate the latest developments in the consumer financial services litigation, enforcement, and compliance areas. We welcome your comments, feedback, and suggestions for issues to address in our next newsletter.*

### Argent Mortgage Company Voluntarily Agrees to Cease and Desist Order Issued by Georgia Department of Banking and Finance

On September 6, 2005, Argent Mortgage Company ("Argent") voluntarily consented to a final cease and desist order issued by the Georgia Department of Banking and Finance ("Department"). The Cease and Desist Consent Order directed Argent to adopt policies and procedures that comply with applicable state laws and regulations, enhance its broker approval and review process, and report suspected mortgage fraud activity by a broker to the Department.

Argent also agreed to implement a set of best practices that derived largely from a Federal Financial Institutions Examination Council white paper issued in February 2005 entitled, *The Detection, Investigation, and Deterrence of Mortgage Loan Fraud Involving Third Parties: A White Paper*. The Consent Order requires Argent to adhere to the following standards:

- **Broker Monitoring:** Monitor closely new brokers, correspondents and products, develop a broker scorecard using objective criteria (*e.g.*, volume, prepayments, credit quality, fallout, FICO scores, loan to values, debt to income ratios, delinquencies, early payment defaults, foreclosures, fraud, documentation, deficiencies, repurchases, timely loan package delivery, concentrations, and quality control findings), and perform due diligence of brokers and correspondents, including adverse database searches during the broker approval process.

- **Employee Training:** Train employees on common mortgage fraud schemes, proper loan origination and closing procedures, and regulatory compliance. Establish a list of "red flags" for underwriting and post-closing audits, and update the list as mortgage fraud schemes evolve.

EXHIBIT 1

Skadden

2

- *Pre-funding Reviews:* Ensure that pre-funding reviews include triggers for verification/re-verification of applicant information such as income, assets, employment, rent, and Social Security Number.

- *Underwriting Policies:* Implement "Common Sense Underwriting" procedures to ensure that terms and conditions of loan programs match the status of the borrowers (*e.g.*, a salaried, large firm employee should apply for a full document program rather than a stated income loan).

- *Anti-Flipping:* Comply with Department guidelines by not approving any purchase transaction for a property that has been sold within the past 12 months and using the prior sales price for refinances with property sold in the past 12 months (provided the price is considered to be the fair market value).

- *Property Occupancy Status:* Establish methods for detecting the occupancy status of residences, namely whether the property is a primary residence or investment property.

- *Closing Agents:* Provide objective requirements to closing attorneys or agents, which include, at minimum, the following closing instructions:

  ° Obtain and review identification on all parties to the transaction, and keep records of parties attending the closing.

  ° No payments from closing funds or liens, invoices, etc. shall be made that have either not been filed with the appropriate recording official or that have been filed within seven days of the closing date.

  ° No payments may be disbursed from closing funds unless the transaction is disclosed on the Settlement Statement.

  ° Verify, where possible, that down payment funds presented at closing come from the borrower and not a third party.

  ° Accept certified funds only from the financial institution that is the verified depository.

  ° Notify Argent if the closing attorney has knowledge of a previous, concurrent, or subsequent primary residential loan transaction involving the borrower or the subject property within the prior 12 months.

**Skadden**

3

- *Appraisal Review:* Strengthen the appraisal review process or outsource the review as needed.

- *QA Reviews:* Increase the number of Georgia loans reviewed by Quality Assurance from 10 percent to at least 25 percent.

Argent agreed to provide the Department with a written progress report within 90 days of the Consent Order summarizing the actions taken to comply with the terms set forth above. For more information, visit the Department's website: *www.gadbf.org.*

### FBI's Statistics in Financial Crimes Report Indicate Emerging Trends in Mortgage Fraud

The Federal Bureau of Investigation ("FBI") issued its *Financial Crimes Report to the Public* in May 2005, which contains a section on mortgage fraud. The Report identifies 26 states as having significant mortgage problems based on recent mortgage industry surveys. Georgia and Florida are the most frequently identified problem states. Other regions with high concentrations of mortgage fraud problems include the South, Southwest, and West.

According to the Report, the number of mortgage fraud related violations reported in Suspicious Activity Reports increased from 4,225 in 2001 to 17,127 in 2004. The Report also shows a rise in pending fraud cases over the past two years. In 2003, there were 436 pending mortgage fraud cases. That number grew to 534 cases in 2004 and jumped to 642 cases in only the first two quarters of 2005. The statistics also showed increases in mortgage fraud related informations and indictments, recoveries, fines and seizures. For a copy of the report, visit *www.fbi.gov/publications.htm.*

### FFIEC Issues White Paper on Third Party Mortgage Loan Fraud

As referenced above, the Federal Financial Institutions Examination Council ("FFIEC") issued a white paper in February 2005 entitled *The Detection, Investigation, and Deterrence of Mortgage Loan Fraud Involving Third Parties: A White Paper,* ("White Paper") which served as the basis for many of the standards set forth in the Argent Consent Order.

The White Paper is based on work undertaken at the FFIEC's Fraud Investigations Symposium, in late 2003, and is divided into four sections. The first section provides background information on the steady increase of third party mortgage fraud and