EXHIBIT 5

1  EMMETT C. STANTON (CSB No. 83930) estanton@fenwick.com
   DAVID M. LISI (CSB No. 154926) dlisi@fenwick.com
2  AARON MYERS (CSB No. 200145) amyers@fenwick.com
   BRYAN A. KOHM (CSB No. 233276) bkohm@fenwick.com
3  FENWICK & WEST LLP
   801 California Street
4  Mountain View, CA 94041
   Tel: (650) 988-8500
5  Fax: (650) 938-5200

6  SHIRLEY HOCHHAUSEN (CSB No. 145619) s_hochhausen@hotmail.com
   COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
7  2117-B University Avenue
   East Palo Alto, CA 94303
8  Tel: (650) 326-6440
   Fax: (650) 326-9722

9

10  Attorneys for Plaintiffs NONA KNOX, ALBERT KNOX, MARIA TORRES,
    HELADIO ARELLANES AND MARIA ARELLANES
11

12              **UNITED STATES DISTRICT COURT**

13       **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

| 14 | NONA KNOX, ALBERT KNOX, MARIA TORRES, HELADIO ARELLANES AND MARIA ARELLANES, on behalf of themselves and those similarly situated, | **Case No. C 05 00240 SC** |
|---|---|---|
| | | **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
| 17 | Plaintiffs, | • **THE TRUTH IN LENDING ACT (15 U.S.C. § 1601);** |
| 18 | v. | • **THE FAIR HOUSING ACT (42 U.S.C. § 3601);** |
| 19 | AMERIQUEST MORTGAGE COMPANY, a Delaware corporation, ARGENT MORTGAGE COMPANY, LLC, a Delaware Limited Liability Company, AND DOES 1-100, inclusive, | • **THE EQUAL CREDIT OPPORTUNITY ACT (15 U.S.C. § 1691);** |
| | | • **THE FAIR EMPLOYMENT AND HOUSING ACT (Cal. Gov. Code § 12900);** |
| 21 | Defendants. | • **THE UNRUH CIVIL RIGHTS ACT (Cal. Civ. Code § 51);** |
| 22 | | • **THE UNFAIR COMPETITION ACT (Cal. Bus. & Prof. Code § 17200);** |
| 23 | | • **THE FALSE ADVERTISING ACT (Cal. Bus. & Prof. Code § 17500);** |
| 24 | | • **THE CONSUMERS LEGAL REMEDIES ACT (Cal. Civ. Code § 1750); AND** |
| 25 | | • **NEGLIGENT TRAINING AND SUPERVISION** |
| 26 | | **SEEKING DAMAGES, DISGORGEMENT, DECLARATORY RELIEF, INJUNCTIVE RELIEF AND PUNITIVE DAMAGES** |
| 28 | | **DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                     1

1       Plaintiffs Nona Knox, Albert Knox, Maria Torres, Heladio Arellanes and Maria Arellanes

2   (collectively "Plaintiffs") hereby allege for their Complaint against Ameriquest Mortgage

3   Company ("Ameriquest"), Argent Mortgage Company ("Argent"), and Does 1 through 100,

4   inclusive (collectively "Defendants"), as follows:

5   **INTRODUCTION**

6       1.    Defendants were and are engaged in unfair, unlawful and deceptive business

7   practices in soliciting, inducing and closing residential loan transactions in the State of California

8   and nationwide.

9       2.    Defendants were and are engaged in a persistent "bait and switch" scheme.

10   Defendants lure borrowers in with promises that their loans will have certain terms and

11   conditions, and later induce them to sign loan contracts with significantly less favorable terms and

12   conditions.

13       3.    During loan transactions, Defendants fail to provide required disclosures,

14   including the statutorily mandated Notice of Right to Cancel.  Defendants circumvent statutory

15   protections by misleading borrowers about loan terms and failing to leave a true copy of loan

16   documents in borrowers' possession, ensuring they cannot review them.

17       4.    Without borrowers' knowledge or consent, Defendants falsify income stated on

18   loan applications to qualify borrowers for larger loans than they can afford.

19       5.    Defendants wrongfully induce borrowers to enter into mortgages that saddle them

20   with monthly payments that exceed the their monthly income or which Defendants know or

21   should know their income cannot support.

22       6.    Defendants charge unfair and excessive fees and expenses that bear no relation to

23   the services rendered, the borrower's credit or risk profile, or other legitimate considerations, and

24   mislead borrowers about those fees and expenses.

25       7.    Defendants induce borrowers to sign loan contracts without reading them through

26   manipulation, deceit and high-pressure tactics.  In the case of borrowers who do not read English,

27   Defendants conduct contract-related discussions in a language other than English (*e.g.*, Spanish)

28   and then provide only English-language documents for signing, while misleading borrowers

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC       1

1    about the contents of those documents.

2        8.    Defendants engage in a pattern of discriminatory conduct—targeting borrowers on

3    the basis of race, national origin, age and gender—and provide those borrowers less favorable

4    terms and conditions in loan contracts than would be provided but for the borrowers' race,

5    national origin, age and/or gender.

6        9.    Due to the predatory lending and unfair business practices summarized above and

7    described in greater detail herein, borrowers who enter loans with Defendants suffer foreclosure

8    at a much higher rate than borrowers with loans from any other privately-held subprime mortgage

9    lender in the country.  Defendants are unconcerned by these foreclosures because Defendants

10    profit from the exorbitant fees and expenses they reap in originating the loans.  Defendants profit

11    again by quickly selling the loans for inclusion in mortgage-backed securities, which allows

12    Defendants to bank the fees and costs paid by borrowers while disguising and hedging the losses

13    that may result from loans going into default.

14        10.    Defendants take these actions intentionally, maliciously, and with conscious

15    disregard for borrowers' legal rights and financial wellbeing.  Despite numerous lawsuits,

16    government investigations and community group actions aimed at stopping the Defendants'

17    predatory lending practices, and despite Defendants' repeated promises of remedial measures in

18    settlement agreements, Defendants continue to run their operations in a manner that enables,

19    encourages and rewards these practices.

20        11.    Despite numerous complaints, Defendants have failed to correct the abuses

21    described herein.  With an estimated $2 billion in profits in 2004 and no public shareholders to

22    answer to, Defendants historically have treated customers' legal challenges as an acceptable cost

23    of doing business.  Defendants will not stop engaging in these predatory and discriminatory

24    lending practices until a court of law forces them to do so through punitive damages and

25    injunctive relief.

26                                    **PARTIES**

27        12.    Plaintiffs Nona and Albert Knox ("Mr. and Mrs. Knox") were at all relevant times

28    residents of East Palo Alto, California.  Mrs. Knox is a resident of East Palo Alto, California,

1    African-American and a senior citizen.  Mr. Knox was a resident of East Palo Alto, California,

2    African-American and a senior citizen.  Mr. Knox is deceased.  Mrs. Knox maintains this action

3    on her own behalf and on behalf of Mr. Knox.

4         13.    Plaintiff Maria Torres ("Mrs. Torres") is and at all relevant times was a resident of

5    East Palo Alto, California.  Mrs. Torres is Hispanic and her native language is Spanish.  Mrs.

6    Torres speaks very little English and is illiterate in English.

7         14.    Plaintiffs Heladio Arellanes and Maria Arellanes ("Mr. and Mrs. Arellanes") are

8    and at all relevant times were residents of Richmond, California.  Mr. and Mrs. Arellanes are

9    Hispanic and their native language is Spanish.  Mr. and Mrs. Arellanes speak very little English

10   and are illiterate in English.

11        15.    On behalf of themselves and all persons similarly situated, Plaintiffs bring this

12   class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

13        16.    Defendant Ameriquest is a privately held corporation organized under the laws of

14   the State of Delaware with its principal place of business in Orange, California.  Ameriquest is

15   the nation's largest privately held subprime lender.  Ameriquest is a wholly owned subsidiary of

16   privately held Ameriquest Capital Corporation.

17        17.    Defendant Argent is a Limited Liability Company organized under the laws of the

18   State of Delaware with its principal place of business in Orange, California.  Argent is a wholly

19   owned subsidiary of Ameriquest.

20        18.    Defendants Does 1 through 100, inclusive, are sued under fictitious names because

21   their true names and capacities are unknown to Plaintiffs, who will further amend this Complaint

22   when their true names and capacities are learned.  Plaintiffs are informed and believe, and on that

23   basis allege, that each of the fictitiously-named Defendants is responsible in some manner for the

24   occurrences alleged herein, and that Plaintiffs' damages were caused by those Defendants.

### JURISDICTION AND VENUE

26        19.    This Court has personal jurisdiction over the Defendants named herein because a

27   substantial portion of the wrongdoing alleged in this Complaint took place in the Northern

28   District of California, Defendants' principal place of business is in California, and Defendants are

1    authorized to and regularly do business in the Northern District of California, including San

2    Mateo County and Contra Costa County.

3         20.    This is an action for violations of 15 U.S.C. § 1601 *et seq.* (Truth in Lending Act,

4    hereafter "TILA"), 42 U.S.C. § 3601 *et seq.* (Fair Housing Act), 15 U.S.C. § 1691 *et seq.* (Equal

5    Credit Opportunity Act), and related state laws.  This Court has subject matter jurisdiction of this

6    action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental

7    jurisdiction).

8         21.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a

9    substantial portion of the events and omissions giving rise to this Complaint occurred within the

10   Northern District of California.  The loan contracts between Plaintiffs and Defendants were made

11   and were/are to be performed, and the obligations arose, in the Northern District of California.

12   **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

13        22.    This lawsuit is brought on behalf of a class consisting of all persons, wherever

14   located, who entered into loan or line of credit transactions with any named Defendant or their

15   predecessors, directly or indirectly, where such transaction involved any of the wrongful conduct

16   described herein ("Class" or "Class Members").  Excluded from the Class are Defendants, their

17   parents, subsidiaries and affiliates, officers and directors, or any entity in which Defendants have

18   a controlling interest, and the legal representatives, successors, or assigns of any such excluded

19   persons.

20        23.    Class Members are so numerous that joinder of all Class Members is

21   impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time,

22   such information can be ascertained through appropriate discovery from records maintained by

23   Defendants and their agents.  Plaintiffs are informed and believe that the number of potential

24   Class Members is in the hundreds or thousands.  In the seven weeks that have passed since the

25   filing of the original complaint in this action, before any effort at class notice, Plaintiffs' counsel

26   have been contacted by a significant number of additional class members, of which

27   approximately half are from California and half are from a number of other states across the

28   country.

24.    Plaintiffs' claims are typical of the claims of Class Members, as Plaintiffs and all Class Members suffered harm arising out of Defendants' wrongful conduct as alleged herein.

25.    Defendants Ameriquest and Argent, though separate entities, are both wholly owned subsidiaries of Ameriquest Capital Corporation, a privately-held corporation, and are engaging in nearly identical wrongful conduct.

26.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in class action and complex civil litigation.

27.    Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members. Among the questions of law and fact common to the Class are:

a.    Whether Defendants or their employees and/or agents have been and are engaged in a pattern of failing to provide required TILA disclosures clearly and conspicuously, in writing and in a form that Class Members can keep and/or understand;

b.    Whether Defendants or their employees and/or agents have been and are engaged in a pattern of falsifying Class Members' income without their knowledge or consent;

c.    Whether Defendants or their employees and/or agents have been and are engaged in a "bait and switch" scheme, in which Class Members have been lured in with promises of a particular set of loan terms, only to learn after entering the transaction that they had received a different and far less beneficial set of terms;

d.    Whether documents, statements, contracts, advertisements and practices relating to the transactions between Class Members and Defendants or their employees and/or agents were unfair, deceptive, untrue, misleading or omitted material facts and disclosures;

e.    Whether Defendants or their employees and/or agents have been and are engaged in discrimination against Class Members on the basis of race, national origin, age and/or gender;

f.    Whether Defendants or their employees and/or agents have been and are engaged in unfair and unlawful business practices, including predatory lending practices against Class Members;

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC

5

Page 58    Exhibit 5

1     g.     Whether the acts of Defendants or their employees and/or agents alleged

2  herein violated other applicable laws;

3     h.     Whether injunctive relief prohibiting Defendants' unfair and unlawful

4  business practices should be issued;

5     i.     Whether declaratory relief giving Class Members the right to rescind their

6  mortgage loans should be issued;

7     j.     Whether Plaintiffs and the Class have sustained damages and, if so, the

8  proper measure of damages; and

9     k.     Whether Plaintiffs and the Class are entitled to punitive damages.

10     28.     A class action is the appropriate form of action for the following reasons:

11     a.     It is superior to other available methods for the fair and efficient

12  adjudication of this controversy because joinder of all Class Members is impracticable;

13     b.     Common questions of law and fact of the Class predominate over any

14  questions that apply only to individual Class Members;

15     c.     Relief is sought to enjoin Defendants from engaging in the wrongful

16  conduct, as alleged herein, and for declaratory relief providing all Class Members the right to

17  rescind any loan contract with any Defendant; and

18     d.     Prosecution of individual actions may result in inconsistent judgments.

19
20  **BACKGROUND ON THE SUBPRIME
MORTGAGE LENDING INDUSTRY**

21     29.     Subprime lenders provide mortgages to borrowers who have impaired credit or are

22  unable to obtain credit in the prime market. *Curbing Predatory Home Mortgage Lending* (June

23  2000), a joint report of the Department of Housing and Urban Development and the Treasury

24  Task Force on Predatory Lending (hereafter "HUD Report") (true and correct copy attached

25  hereto as **Exhibit A**), p. 27. Borrowers with "A" credit scores generally can obtain mortgage

26  loans in the prime market, while borrowers with credit scores of "A-" generally must turn to the

27  subprime market. *Id.* at 33. Some borrowers, even though they have a good credit history, are

28  unable to obtain prime mortgages because of other factors, including self-employment, high debt-

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                6

1    to-income ratios or institutional biases against certain categories of borrowers. *Id.* at 27.

2        30.    Subprime borrowers with a credit score of "A-" tend to pay about one-half of a

3    percentage point above the prime rate, while those borrowers with lower credit scores ("C" and

4    "D" scores) pay as much as four percentage points above the prime rate. *Id.* at 28.

5        31.    Subprime lenders justify the higher fees and rates charged to borrowers by

6    pointing to the higher risks associated with subprime loans. *Id.* at 27.  To the extent that subprime

7    lenders put borrowers into high-cost loans they cannot afford, subprime lending may be riskier for

8    the lender than most conventional lending.  However, the potential payoffs to the lender more

9    than make up for the risk, as the lender usually profits handsomely from large up-front loan

10   origination fees and hefty interest rates.

11       32.    As a percentage, relatively few subprime mortgage loans are used to purchase a

12   home; instead, most subprime borrowers refinance their home mortgage to use the equity in their

13   homes for debt consolidation or other consumer credit purposes. *Id.* at 26, 30.

14       33.    The subprime market has grown dramatically over the last decade.  Subprime

15   mortgage originations grew from $34 billion in 1994, to $160 billion in 1999, to $216 billion in

16   2002, to over $587 billion in 2004. *Consumer Protection:  Federal and State Agencies Face*

17   *Challenges in Combating Predatory Lending* (January 2004), United States General Accounting

18   Office, Report to the Chairman and Ranking Minority Member, Special Committee on Aging,

19   U.S. Senate (hereafter "GAO Report") (true and correct copy attached hereto as **Exhibit B**),

20   p. 21; *Stolen Wealth:  Inequities in California's Subprime Mortgage Market* (December 2001), a

21   report of the California Reinvestment Committee (hereafter "CRC Report") (true and correct

22   copy attached hereto as **Exhibit C**), p. 7; M. Hudson, *Workers Say Lender Ran 'Boiler Rooms,'*

23   LOS ANGELES TIMES, February 4, 2005 (hereafter "Hudson") (true and correct copy attached

24   hereto as **Exhibit D**), p. 7.

25       34.    In 2004, $197 billion in subprime loans were originated in California, more than

26   double the volume in 2003.  R. Mullins, *When Home Mortgages Go Wrong – Groups Seek to End*

27   *Abuses in Lending Markets*, SILICON VALLEY-SAN JOSE BUSINESS JOURNAL, February 25, 2005

28   (hereafter "Mullins") (true and correct copy attached hereto as **Exhibit E**), p. 3.

35. Ameriquest is the nation's largest privately held subprime lender. Although Ameriquest has not released such information, it is estimated that Ameriquest made $2 billion in profits in 2004, doubling its estimated $1 billion in profits in 2003. News reports estimate that Ameriquest originated over $50 billion in subprime loans in 2004. Hudson at 7. Because Ameriquest is privately held, it is not accountable to shareholders, nor constrained by laws or regulations imposed on public companies.

36. It is important to distinguish subprime lending from predatory lending. Subprime lending is not inherently abusive. Subprime lenders provide many credit-troubled borrowers with the means to purchase a home, access equity in a home, and consolidate debts.

37. However, it is widely accepted that the overwhelming majority of predatory lending occurs in the subprime market. GAO Report at 21. Due to the great variety and complexity of risks associated with subprime lending, subprime loans are not uniformly priced commodities, and this increases borrowers' vulnerability to abuse. *Id.*. Subprime lending turns into predatory lending when it involves certain types of abusive practices described below. According to the California Reinvestment Committee ("CRC"), a nonprofit membership organization of more than 200 nonprofit organizations and public agencies in California, over one-third of the subprime borrowers included in its study may have been victimized by predatory lending. CRC Report at 4.

38. A major source of the subprime market's rapid growth has been the securitization of subprime mortgages, whereby bundles of mortgages are sold to banks, which issue "mortgage-backed securities" representing ownership in those loans. HUD Report at 41. Securitization has assisted predatory lenders by providing an outlet for those lenders to sell off predatory loans likely to result in default. This enables predatory lenders to profit from the high upfront fees charged to borrowers, but avoid the risk of suffering losses from loans going into default. According to Moody's Investors Service, Ameriquest securitized 75% of its subprime loan production in 2003.

39. The rate of foreclosures of subprime mortgage loans has increased substantially since 1990, far exceeding the rate of increase in subprime originations. GAO Report at 24.

## PREDATORY LENDING PRACTICES DECEITFULLY AND UNFAIRLY TAKE ADVANTAGE OF VULNERABLE CONSUMERS

40.    There is no uniformly accepted definition of predatory lending. However, the United States Department of Housing and Urban Development ("HUD") has defined predatory lending as lending "involving deception or fraud, manipulation of borrowers through aggressive sales tactics, or taking unfair advantage of a borrower's lack of understanding about loan terms." HUD Report at 1. According to HUD, "These practices are often combined with loan terms that, alone or in combination, are abusive or make the borrower more vulnerable to abusive practices." *Id.*

41.    HUD, CRC and the United States General Accounting Office ("GAO") have identified various practices that constitute predatory lending. Since predatory lenders are constantly developing new techniques to take advantage of borrowers, any enumeration of predatory practices necessarily will be incomplete. Nevertheless, it is generally accepted by the lending industry and government agencies that monitor that industry that predatory lending practices include the following: (a) charging excessive fees, points and interest rates unrelated to the borrower's credit/risk profile; (b) misleading a borrower about the borrower's credit/risk profile to steer the borrower to a high-cost loan unjustified by the borrower's true profile; (c) lending without regard to borrowers' ability to repay; (d) causing borrowers to refinance loans multiple times over a short period of time without any economic gain to the borrower ("loan flipping"); (e) imposing excessive prepayment penalties that trap borrowers into predatory loans; (f) engaging in aggressive, high-pressure and/or misleading sales tactics; (g) making misrepresentations or otherwise misleading borrowers about loan terms; (h) falsifying loan documents; and, (i) targeting low-income, elderly and minority borrowers for predatory lending tactics. GAO Report, pp. 3, 17; CRC Report, pp. 4, 5, 8. These practices, individually and collectively, will be referred to herein as "Predatory Lending Practices."

42.    Abuses in loan servicing also have increasingly become a problem; such abuses include not properly crediting payments and charging improper late fees. GAO Report at 20.

43.    Equity-based lending—extending loans based on the equity in the house, as

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    9

1    opposed to the borrower's ability to repay the loan—is a common Predatory Lending Practice.

2    HUD Report at 2; GAO Report at 19.  In egregious cases, equity-based lending results in monthly

3    loan payments that equal or exceed the borrower's total monthly income.  *Id.*  Lenders who

4    engage in equity-based lending often falsify borrowers' income on loan applications to conceal it.

5    Equity-based lending frequently leads borrowers to default and foreclosure.  *Id.*

6         44.    Predatory lenders knowingly make loans with high loan-to-value ratios.  This

7    skims the equity from the property, places the borrower in jeopardy of default, and puts the

8    borrower in the position of spending years paying off refinanced loan balances without

9    developing any equity.

10        45.    Predatory lenders use prepayment penalties as a means to trap borrowers into loans

11   with onerous terms, so that borrowers cannot refinance with an honest vendor to escape those

12   terms without incurring thousands of dollars in fees, further sucking the equity from their homes.

13   *See* GAO Report at 19; CRC Report at 32-33.

14        46.    Predatory lenders use aggressive high-pressure sales and marketing techniques to

15   lure in victims for their Predatory Lending Practices.  These techniques include repeated direct

16   mailings, telemarketing (sometimes involving multiple daily calls), and in-home solicitations.

17   GAO Report at 94.  Predatory lenders use these techniques because they can be particularly

18   effective when directed to the elderly, minorities and other less financially sophisticated

19   consumers that may be uncomfortable approaching mainstream financial institutions or otherwise

20   lack access to them.  *See* HUD Report at 22-23.

21        47.    Predatory lenders bait borrowers by promising "savings" from debt consolidation

22   or the option to "cash out" a portion of a borrower's home equity.  GAO Report at 20.

23   Unbeknownst to the borrowers, most of the "cashing out" goes right into the lender's pocket in

24   the form of fees and excessive interest.

25        48.    While some borrowers in the subprime market are genuine credit risks, many low-

26   income, elderly and minority borrowers may resort to subprime lenders because they have not

27   been comfortable seeking out conventional lenders or have been turned away by them in the past.

28   Predatory lenders target such consumers for subprime loans.  Worse, predatory lenders often

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    10

Page  63          Exhibit  5

1   mislead borrowers about their credit ratings and steer borrowers who could qualify for prime

2   loans into taking subprime loans.  A 2001 poll of the 50 most active subprime lenders found that

3   50% of their clients could qualify for a conventional loan.  CRC Report at 22.  The practice of

4   targeting communities with a primarily low-income, elderly, or racial/ethnic minority population

5   for imposition of unjustifiably expensive loan terms is known as "reverse redlining."

6        49.    Predatory lenders also engage in the practice of persuading financially troubled

7   individuals and families that the solution to their problems is to consolidate their unsecured debt

8   into their home mortgage.  Although consolidating unsecured debt into secured debt may be

9   appropriate and beneficial to some borrowers, predatory lenders promote it even if the resulting

10  monthly mortgage payment exceeds what borrowers can afford to pay.  In these circumstances,

11  debt that would not otherwise lead to foreclosure for nonpayment causes borrowers to default on

12  their mortgage payments and eventually leads to foreclosure and loss of the family home.  CRC

13  Report at 24-25.

14       50.    Predatory lenders frequently deceive borrowers and engage in outright fraud

15  through practices such as falsifying loan applications and settlement documents, forging

16  signatures, and promising borrowers that if they take a loan with a high interest rate, they can

17  refinance for a lower interest rate after a short period at no cost.  GAO Report at 19.

18       51.    Another common predatory lending practice involves inflating property appraisals.

19  When lenders inflate appraisals and thereby induce borrowers to enter loans that exceed the value

20  of their homes, borrowers become trapped in their loans; they are precluded from selling their

21  homes to pay off the mortgages because they cannot afford the large cash payment required to

22  satisfy the deficiency between the sale price and the principal balance.  This practice benefits

23  predatory lenders by collecting the closing costs from a loan that otherwise should not have been

24  issued, and by locking borrowers into high rate loans by precluding refinancing since the

25  borrower's equity is already overextended.

26       52.    Low-income minorities and the elderly are the primary victims of Predatory

27  Lending Practices.  Predatory lenders prey on low-income minorities, particularly those who may

28  not be able to speak or read English, and may be more likely to be less educated, financially

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    11        Page  64   Exhibit  5

1   unsophisticated and lacking access to mainstream financial outlets.  Predatory lenders prey on the

2   elderly since they may be more likely to have diminished cognitive abilities, isolated living

3   situations and substantial equity in their homes.  CRC Report at 41-43.

4         53.    Predatory Lending Practices condemn homeowners to a cycle of refinancing,

5   foreclosure, economic ruination, and segregation from conventional, mainstream credit.  *Id.* at 6.

6   On a larger scale, when Predatory Lending Practices are concentrated in certain neighborhoods—

7   as they frequently are—communities suffer from destabilization through the loss of equity,

8   distressed and vacant properties, and stifled economic development.  *Id.*  This causes the

9   depression of property values and makes entire neighborhoods pay the price for the unscrupulous

10   lenders' wrongful practices.

### DEFENDANTS' LONG HISTORY OF PREDATORY AND DISCRIMINATORY LENDING PRACTICES

13         54.    Defendants have a long history of willfully, maliciously and/or recklessly

14   engaging in Predatory Lending Practices.  Defendants have intentionally, knowingly, recklessly

15   and/or negligently ignored the Predatory Lending Practices committed by their employees and

16   agents; failed to adequately train and supervise employees to prevent those employees from

17   engaging in Predatory Lending Practices; provided incentives and rewarded employees and

18   agents that engaged in Predatory Lending Practices; and after being put on notice of the Predatory

19   Lending Practices of their employees and agents, neglected to take effective corrective measures

20   to remedy the injuries caused to borrowers.  Defendants have targeted and discriminated against

21   borrowers on the basis of race, national origin, gender and age.  Defendants have ignored and

22   circumvented statutory and industry safeguards intended to protect the borrowers that Defendants

23   target.

24         55.    Plaintiffs are informed and believe, and on that basis allege, that despite numerous

25   efforts by government agencies, community groups and private litigants to put an end to

26   Defendants' Predatory Lending Practices, Defendants have allowed those practices to continue.

27         56.    In 1995, the U.S. Department of Justice ("DOJ") filed a complaint against

28   Ameriquest, then known as Long Beach Mortgage Company ("LBMC"), for discriminatory and

1   predatory lending practices.  A true and correct copy of the DOJ's complaint is attached hereto as

2   **Exhibit F**.  The complaint alleges that during the period January 1991 through June 1994, LMBC

3   engaged in lending practices that constituted unlawful discrimination on the basis of race,

4   national origin, gender and age.  In the complaint, the DOJ alleged in pertinent part:

5           Long Beach has not properly instructed its employees or
        brokers regarding their obligation to treat prospective customers
6       without regard to race, national origin, gender or age; and the lender
        has failed to supervise or monitor the performance of employees
7       and brokers to ensure that loan proposals would lead to compliance
        with fair lending laws...
8

9           In addition to a borrower's risk level, Long Beach's loan
        pricing system has been based on the race, national origin, gender
10      or age of the applicant.... The totality of loan originations by Long
        Beach reveals that African Americans, Latinos, women, and
11      persons over the age of 55 were charged higher prices for their
        loans than the terms and conditions granted to persons without
12      those characteristics who presented similar levels of risk to the
        lender.
13          Long Beach has used a number of devices to obtain higher
        prices from African Americans, Latinos, women and persons over
14      the age of 55.  Long Beach has directed its marketing efforts toward
        persons and neighborhoods, particularly minority neighborhoods,
15      that Long Beach officials believed might be susceptible to the
        higher prices that would be demanded by the lender without stating
16      the cost of its loans or that the cost of its loans was substantially
        higher than "A" mortgage lenders.  In dealing with consumers, loan
17      officers and brokers have emphasized low monthly payment
        amounts when discussing the price of the loan, rather than interest
18      rate, points, or Annual Percentage Rate.  These methods have
        allowed Long Beach to present terms and conditions that appeared
19      to be favorable to the consumer, but in fact would cost the
        consumer considerably more money than was necessary to obtain
20      the loan, given the turnover rate of the loans at issue....

21

22

23      57.     In 1996, LBMC entered into a $4 million settlement agreement with the DOJ to

24  resolve these charges.  A true and correct copy of the settlement agreement is attached hereto as

25  **Exhibit G**.  As part of the agreement, LBMC entered a "General Undertaking" as follows:

26

27

28

1    LBMC, its officials, employees, and agents, as well as
2    successors, will not engage in any act or practice that discriminates
     on the basis of age, sex, race or national origin in the pricing of
3    mortgage loans as prohibited by the Fair Housing Act (42 U.S.C.
     §§ 3601-3619) and the Equal Credit Opportunity Act (15 U.S.C.
4    § 1691-1691f).

5    58.    Also as part of the settlement agreement, LMBC entered a "Specific Undertaking"

6    to "implement the following measures with respect to its retail mortgage lending operations to

7    address the concerns raised by the United States." Pursuant to the Specific Undertaking, LBMC

8    promised that all LBMC employees involved in retail mortgage loan pricing shall complete a

9    training course appropriate for the duties and responsibilities of each such individual, and that

10   training courses shall include the following elements:

11       1. a detailed discussion of LBMC's responsibilities under this
12          Agreement;

13       2. a detailed discussion of the purpose of, and prohibitions
            contained in, the Fair Housing Act and the Equal Credit
14          Opportunity Act;

15       3. a detailed discussion of individual and principal liability for
            violations of the Fair Housing Act and the Equal Credit
16          Opportunity Act;

17       4. a detailed discussion of LBMC's policies regarding
18          discrimination, including the policy that it is unlawful for LBMC
            personnel to make differing initial price quotations on the basis of
19          a loan applicant's race, national origin, sex or age;

20       5. a detailed discussion regarding LBMC's disciplinary policy
            regarding violations of the Fair Housing Act and the Equal Credit
21          Opportunity Act by employees; and

22       6. a detailed discussion of the applicability of fair lending laws to
23          mortgage loan pricing.

24   59.    Also pursuant to the Specific Undertaking, LBMC promised that, "Insofar as

25   LBMC desires to continue to utilize risk-based pricing, LBMC shall use its best efforts to place

26   mortgage loan applicants in appropriate risk classifications based on objective credit and risk-

27   related criteria."

28   60.    As further part of the Specific Undertaking, LBMC promised to create and

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    14

1    implement a Retail Loan Monitoring System, and in connection with that System, to conduct

2    quarterly reviews and produce quarterly reports to the United States addressing "LBMC's

3    performance in the pricing of funded retail mortgage loans to members of protected classes" and

4    providing "descriptive statistics of funded retail mortgage loan prices broken down by age, sex,

5    race and national origin."

6         61.    "To promote the objectives of the fair lending laws, in connection with its

7    wholesale mortgage loan operations," LBMC promised in the settlement agreement to "inform all

8    brokers with which it has an existing contractual arrangement and all brokers with whom it

9    creates a contractual relationship for the duration of this Agreement":

10         a.   that LBMC will adhere to the Fair Housing Act and the Equal
              Credit Opportunity Act in all aspects of the credit process
11             including the pricing of mortgage loans;

12         b.   that LBMC maintains loan underwriting standards designed
              to ensure that loan applicants will be placed at the correct
13             credit risk level on a non-discriminatory basis;

14         c.   that LBMC's wholesale price sheets reflect the price it seeks
              to obtain for mortgage loans at each credit risk level and that
15             the wholesale broker may charge borrowers such additional
              amounts as may be permitted by applicable law;
16
           d.   that LBMC reserves the right to reject the broker's proposal or
17             make a counteroffer when it believes the broker's proposed
              compensation and costs are not permitted under the fair
18             lending laws; and

19         e.   that each wholesale broker must provide the proposed
              borrower with such disclosures concerning broker
20             compensation as may be required under applicable law.

21         62.    Under the settlement agreement, LBMC agreed to pay $3,000,000 into a fund to

22    compensate up to 1,200 consumers who had received LBMC loans, and to pay $1,000,000 into a

23    community education fund.

24         63.    In April 1997, less than one year after entering into the settlement agreement with

25    the DOJ, LBMC changed its name to Ameriquest Mortgage Company. A true and correct copy

26    of LBMC's amended articles of incorporation is attached as **Exhibit H**. Around the same time,

27    Long Beach Financial Services ("LBFS"), LBMC's parent company, changed its name to

28    Ameriquest Capital Corporation. A true and correct copy of LBFS's amended articles of

1    incorporation is attached hereto as **Exhibit I**.

2      64.    Plaintiffs are informed and believe, and on that basis allege, that despite being put

3    on notice nearly a decade ago—and repeatedly since then—about the conduct of its employees

4    and agents, Defendants have intentionally failed to take effective remedial measures to prevent

5    the recurrence of the practices alleged in the DOJ's complaint.

6      65.    In 1999, the Association of Community Organizations for Reform Now (hereafter,

7    "ACORN"), the nation's largest community organization of low- and moderate-income families,

8    initiated a campaign to force Ameriquest to change its predatory lending practices.  A true and

9    correct copy of a printout from ACORN's website is attached hereto as **Exhibit J**.  ACORN

10   organized demonstrations, pickets, and sit-ins at Ameriquest offices; demonstrations at the offices

11   of the Wall Street firms that supply Ameriquest with its financing; the filing of complaints with

12   state Attorneys General, the Federal Trade Commission, and the Department of Justice; and

13   aggressive lobbying of Congress Members, federal regulators, HUD, and the Treasury.

14   Ameriquest agreed to negotiate with ACORN in July 2000, and three months later signed an

15   agreement to invest $360 million in an ACORN pilot program.  In ten cities, Ameriquest agreed

16   to make subprime loans with no prepayment penalties, no credit insurance, a limit on points and

17   fees at 3 percent of a loan, interest rates below the market standard, and loan counseling by

18   ACORN Housing Corporation for every potential borrower.

19     66.    Discussing the ACORN agreement, Adam Bass, senior executive vice president at

20   Ameriquest, stated:  "We did some things which I think are pretty revolutionary," including

21   giving borrowers seven days instead of three days to review their loans, and providing loan

22   disclosure statements written in "plain English—Here's your loan, here are the terms, this is how

23   much you're borrowing, this is how much you're paying us—simple, plain disclosures."  A true

24   and correct copy of the article in which Mr. Bass is quoted making these statements is attached

25   hereto as **Exhibit K**.  These statements by Mr. Bass were false, as Ameriquest has failed to fulfill

26   its promises to effectively give borrowers a seven-day rescission period or to effectively provide

27   borrowers with truthful loan disclosure statements.

28     67.    In 2000, partly as a result of the ACORN campaign, Ameriquest adopted its so-

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                16

1  called "Best Practices."   A true and correct copy of a printout of the "Best Practices" page on

2  Ameriquest's website is attached hereto as **Exhibit L**.  Ameriquest's "Best Practices" policy

3  provides in pertinent part:

4
5  > We believe consumers should (1) receive clear and timely disclosures of the terms of a proposed loan and their options; (2) have adequate time to evaluate and negotiate those terms and; (3) have the ability to obtain the advice of independent advisors as to whether the loan is one they should accept...
6
7
8  > Ameriquest does not tolerate misrepresentation of the terms and conditions of a loan and strives to ensure that our customers are fully informed about the transactions they are considering.  To achieve this goal, our Early Disclosure Package is automated to avoid manual processing errors, and centrally generated to ensure the package is sent to applicants within three business days from when their loan application is received...
9
10
11
12  > Although the value and condition of the real property always play into a mortgage lender's loan decision, we do not lend based on the "equity" in the property alone...
13
14  > Our system-driven, risk-based price model determines a consistent, benchmark price offer based on the overall risk profile of a loan transaction...
15
16  > Our marketing efforts support equal lending opportunities to all who qualify and do not target consumers based on race, color, national origin, religion, marital status, familial status, sexual preference, gender, age or handicap. We do not sell customer information to third parties for marketing purposes...
17
18
19
20  > When a customer contacts us to refinance or requests a payoff statement through another lender, we work with the customer to retain our relationship. Ameriquest, however, does not solicit existing customers within the first 24 months of their loan...
21
22
23  > We seek to ensure accurate property valuations through the use of licensed appraisers and cutting-edge technology. Appraisals must be full appraisals, with an interior inspection performed in accordance the Uniform Standards of Professional Appraisal Practice. To ensure compliance with these requirements, we maintain lists of approved appraisers, perform an automated review of all appraisals prior to funding, and audit a random sample of appraisals on a monthly basis...
24
25
26
27
28

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                          17         Page 70      Exhibit 5



1     68.    Despite Ameriquest's publication of the "Best Practices" and frequent references

2    to the policy in public statements, Ameriquest has failed, and continues to fail, to live up these

3    promises. Indeed, many of the statements in the "Best Practices" are outright false. Ameriquest's

4    proclamation of the "Best Practices" in 2000 did not end its Predatory Lending Practices or stem

5    the tide of complaints lodged against it.

6     69.    Ameriquest customers filed more complaints with the Federal Trade Commissions

7    from 2000 through 2004 than did those of its two biggest competitors combined and doubled—

8    466 for Ameriquest compared with 101 for Full Spectrum Lending and 51 for New Century

9    Financial. Hudson at 2.

10     70.    Ameriquest customers filed more complaints with the California Department of

11    Corporations from 2000 through 2004 than did those of its two biggest competitors combined and

12    doubled—134 for Ameriquest compared with 21 for Full Spectrum Lending and 39 for New

13    Century Financial. Hudson at 2.

14     71.    In or about 2002, Iowa Citizens for Community Improvement (ICCI) challenged

15    Ameriquest over the company's predatory lending practices. A true and correct copy of a

16    printout from ICCI's website is attached hereto as **Exhibit M**. As described therein, in June

17    2003, ICCI signed a partnership agreement with Ameriquest Mortgage in which the company:

18
19            outlines lending standards and practices they will maintain or adopt in
            Iowa; agrees to review loans in foreclosure to see if they conform with
            these standards; agrees to adjust or modify loans not in compliance with
20            these standards to put them in compliance; and creates a CCI / Ameriquest
            partnership board to monitor the agreement. This new partnership
21            agreement, which covers the entire state of Iowa, also lays the foundation
            for CCI and Ameriquest to work together in the future to promote stable
22            home ownership and reduce the damage predatory lending does to our
23            communities.

24     72.    In January 2004, Defendants Ameriquest and Argent, along with sister subsidiary

25    Town & Country Mortgage, settled charges brought by the State of Connecticut for charging

26    excessive prepayment penalties from 2001 to 2003 in violation of state fair lending laws. A true

27    and correct copy of the settlement agreement is attached hereto as **Exhibit N**.

28     73.    In January 2005, the State of Connecticut refused to renew Defendants' licenses to

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC         18      Page  *71*    Exhibit  *5*

1   do business in the state and filed charges seeking civil penalties, finding that despite the barely

2   one-year-old settlement agreement between Defendants and the State, Defendants had continued

3   to repeatedly charge excessive prepayment penalties in violation of state fair lending laws.  A true

4   and correct copy of the Notice of Intent to Issue Order to Cease and Desist, to Refuse to Renew

5   First and Secondary Mortgage Lender/Broker Licenses, and to Impose Civil Penalty is attached

6   hereto as **Exhibit O**.  In a letter to Defendants confirming the denial of their license renewal

7   applications, the Connecticut State Banking Commissioner stated: "I am unable to find that the

8   financial responsibility, character, reputation, integrity and general fitness of the Applicant and of

9   its officers, directors and principal employees are such as to warrant belief that the Applicant's

10  business will be operated soundly and efficiently, in the public interest and consistent with the

11  purposes" of the cited state fair lending laws.  A true and correct copy of the Banking

12  Commissioner's letter is attached hereto as **Exhibit P**.

13      74.    On information and belief, in or about February 2005, the banking department of

14  the State of Massachusetts suspended Defendants' licenses to do business in the state.

15      75.    Recent lawsuits filed by consumers in California and at least 20 other states allege

16  a pattern of fraud, falsification of documents, bait-and-switch sales tactics and other predatory

17  lending practices.  Hudson at 2.

18                    **DEFENDANTS' FAILURE TO ADEQUATELY TRAIN**
19                         **AND SUPERVISE EMPLOYEES**

20      76.    Despite repeatedly undertaking to do so, as described above, Defendants have

21  failed to adequately train and supervise its employees to prevent Predatory Lending Practices.

22      77.    Instead, Defendants have perpetuated inadequate training procedures, high-

23  pressure "anything goes" work environments, and an overall corporate culture in which

24  employees' predatory practices are enabled, encouraged and rewarded—and ultimately become

25  inevitable.

26      78.    Former employees have taken their stories to the courts, the American press and

27  the Internet.  Although they worked in Ameriquest offices in different states hundreds or

28  thousands of miles apart, they describe strikingly similar conduct.  Allegations of falsifying

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    19

Page  72   Exhibit  5

1   documents to hit sales quotas are a common thread in more than 24 accounts from ex-workers.

2   Hudson at 2, 4.

3       79.     Mark Bomchill, a former employee in suburban Minneapolis, said that employees

4   forged documents, hyped customers' creditworthiness and "juiced" mortgages with hidden rates

5   and fees. Bomchill said that the drive to close deals and grab six-figure salaries pushed

6   employees to engage these predatory tactics: "It was like a boiler room. You produce, you make

7   a lot of money. Or you move on. There's no real compassion or understanding of the position

8   they're putting their customers in." Bomchill said that management imposed this culture on

9   them: one supervisor prowled the aisles between desks, hounding agents to make more calls and

10  push more loans, bragging that he hired and fired people so fast that one worker would be

11  cleaning out his desk as his replacement came through the door. Hudson at 1.

12      80.     Many of the ex-employees likened Ameriquest's culture to the rough-and-tumble

13  world of "Boiler Room," a motion picture released in 2000 about fast-talking young stock

14  swindlers who revel in their powers of anything-goes salesmanship until the operation is shut

15  down for engaging in fraud. Hudson at 6.

16      81.     Lisa Taylor, a former loan agent at Ameriquest's customer-retention office in

17  Sacramento, said: "That was your homework — to watch 'Boiler Room.'" Taylor said that

18  managers and employees passed around the film to keep themselves fired up. Taylor also said

19  that she witnessed documents being altered when she walked in on co-workers using a brightly

20  lighted Coke machine as a tracing board, copying borrowers' signatures on an unsigned piece of

21  paper. Hudson at 6.

22      82.     Omar Ross, a former Ameriquest employee in Grand Rapids, Michigan, said: "I

23  don't think there's a day that went by that I wasn't told I was going to be fired. I was told I was

24  going to be fired at least 200 times." Supervisors pressured Ross and other employees even when

25  they were meeting their quotas. According to Ross, supervisors said: "'Omar did 10. How come

26  everybody else can't do 10?'' Then in private they would turn around and say: 'Why can't you

27  do more? You're slacking. You're capable of doing more.'" Hudson at 8.

28      83.     Brien Hanley, a former loan agent at an Ameriquest branch in suburban Kansas

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                          20

1  City, Kansas, said he witnessed Ameriquest employees fabricating borrowers' income and

2  falsifying appraisals to make loans go through. "Whatever you had to do to close a loan, that's

3  what was done. If you had to state somebody's income at $8,000 a month and they were a day-

4  care provider, who's to say it wasn't?" Hudson at 5.

5      84.    Several other former loan officers said employees frequently abused the

6  company's "stated income" loan program, which requires only a letter from the borrower

7  declaring how much he or she makes. According to these loan officers, borrowers were told what

8  their income had to be to qualify and were often coached to invent fictitious side jobs, such as

9  home-based computer consulting, to reach that number. Nearly one out of every six Ameriquest

10 mortgages sold to Wall Street investors in 2004 was a stated income loan. Hudson at 5-6.

11     85.    Bomchill, the former employee in suburban Minneapolis, said: "Ameriquest

12 managers often discouraged questionable practices — but with a wink: It was kind of … see no

13 evil, hear no evil." Three other former workers at the branch said Bomchill's description was

14 accurate. Hudson at 6.

15     86.    In a sworn declaration filed in a case in Redwood City, California, a former loan

16 officer named Kenneth Kendall said Ameriquest managers encouraged employees to "promise

17 certain interest rates and fees, only to change those rates at the time of the closing." Hudson at 2.

18     87.    Property appraisers in six states said that Ameriquest employees had tried to

19 bulldoze them into inflating home values and, in some cases, lying about property defects. Greg

20 Boyd, an appraiser in Hopland, California, said Ameriquest loan officers employed high-pressure

21 tactics to force appraisers to go along with their demands. Hudson at 5.

22     88.    Former Ameriquest loan officers said employees engage in hard-sell tactics under

23 pressure from managers, including ten- and twelve-hour days punctuated by "power hours"—

24 nonstop cold-calling sessions to lists of prospects burdened with credit card bills—to persuade

25 them to roll their debts into new mortgages on their homes. Hudson at 8.

26     89.    These former employees said that employees who put up big numbers are

27 rewarded with trips to Hawaii and the Super Bowl and, in some cases, with $100,000-plus

28 salaries. Employees said that no matter how many loans they peddled, the pressure rarely eased.

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    21

1    Hudson at 8.

2    90.    Defendants encourage this corporate culture from the top down.  Recent job fair

3    advertisements by Ameriquest seek applicants with no college education and less than one year of

4    experience, and promise that while salaries start at $24,000 or $27,000, with bonuses for sales

5    production new employees can make $150,000 in their first year, even $250,000.  True and

6    correct copies of several Ameriquest job fair advertisements are attached hereto as **Exhibit Q**.

7    Each states:

8    
9                 Last month we hired a person without prior mortgage experience
                  who made $14,500 in commissions during his second month with
                  the company.  YOU CAN MAKE ENOUGH MONEY HERE TO
10                DRIVE A FERRARI.  You can make over $150,000 your first
                  year with us.

11
                  Our top producers are currently making $15,000 to $20,000 per
12                month.

13                The average sales person makes $10,000 to $15,000 per month
                  with Ameriquest Mortgage.
14

15    91.    Defendants are responsible for perpetuating a high-pressure, "anything goes," "see

16    no evil, hear no evil" sales atmosphere in which abuses become inevitable.  In court documents

17    and interviews, 32 former employees across the country say they witnessed or participated in

18    improper practices, mostly in 2003 and 2004, including deceiving borrowers about the terms of

19    their loans, forging documents, falsifying appraisals and fabricating borrowers' income to qualify

20    them for loans they could not afford.  Hudson at 2.

21    92.    In online forums, numerous persons who say they are former Ameriquest

22    employees from different states across the country have published similar accounts.  True and

23    correct copies of printouts from one such website are attached hereto as **Exhibit R**.  These

24    accounts include descriptions of Ameriquest training employees to (a) forge documents; (b) trace

25    signatures; (c) falsify income; (d) coerce appraisers to inflate appraisals; (e) promise one set of

26    terms and string borrowers along only to increase the rates, points or other costs just before

27    closing; (f) impose unjustified rates, points, costs and prepayment penalties; and, (g) not leave

28    true copies of loan documents with borrowers.  One of these persons states that in each of the two

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    22

1    offices he worked, Ameriquest made employees watch "Boiler Room." Another states that

2    supervisors openly joked with employees about ripping off minorities.

3        93.    Plaintiffs' counsel have interviewed former Ameriquest employees in two states

4    with similar accounts.

5        94.    Plaintiffs are informed and believe, and on that basis allege, that Defendants allow

6    certain branches to be "boiler room operations" while requiring other branches to remain "above

7    the board."

8        95.    Plaintiffs are informed and believe, and on that basis allege, that one such boiler

9    room operation is the Ameriquest office on Fashion Island Boulevard in San Mateo, California,

10   that is responsible for two of the loans described by Plaintiffs herein.

11       96.    Joseph Khaliq, a former Ameriquest employee who worked in the Ameriquest

12   office on Fashion Island Boulevard in San Mateo from late 2001 to late 2003, submitted a sworn

13   declaration to this Court in a recent action against Ameriquest in which he described the conduct

14   he saw while employed in that office. A true and correct copy of Mr. Khaliq's declaration is

15   attached hereto as **Exhibit S.** In the declaration, Mr. Khaliq stated:

16       a.    "I observed . . . Ameriquest employees give instructions to or otherwise not

17   provide loan documents, including complete cancellation notices, to borrowers at the time of

18   closing;

19       b.    "I observed situations where Ameriquest employees would mail the

20   package of closing documents to borrowers after closing in a manner calculated to reach the

21   customers after the time to cancel the loan had passed. I was aware that this was done in order to

22   prevent customers from canceling the loan within the allowable time."

23       c.    "Some loan personnel at Ameriquest told me that they never provided

24   some borrowers with their copy of the closing documents, even by mail."

25       d.    "I also often witnessed . . . Ameriquest employees ask borrowers to sign

26   blank documents. After borrowers would leave, [those] employees would fill out the loan

27   documents as they saw fit. For example, I witnessed borrowers being asked to sign a 'Notice of

28   Right to Cancel' form without the date to cancel filled in. After the customers would leave, a

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    23

1    manager . . . would fill in the date to cancel before sending the closing documents to the home

2    office. Sometime, the date never would be filled in, as I know from seeking already closed loan

3    files where the 'Notice of Right to Cancel' contained a borrower's signature but no date in the

4    cancellation date box."

5         e.    "I witnessed employees at the San Mateo Branch . . . forge borrower's

6    signatures on loan documents."

7         f.    "[I] commonly witnessed the notarization of loan documents after they had

8         been signed by the borrower outside of the notary's presence."

9         g.    "Ameriquest employees were supposed to disclose to borrowers the

10    existence of a prepayment penalty on the loan that was being refinanced. Most of the time, I did

11    not see Ameriquest disclose the existence of that prepayment penalty. Instead, the prepayment

12    penalty would be lumped into the prior loan payoff amount in a manner calculated to make

13    borrowers miss the fact that they could be paying a prepayment penalty."

14         h.    "I often witnessed . . . Ameriquest employees inflate a borrower's assets.

15    From my experience at Ameriquest, I believe this was for the dual purpose of both making sure

16    the loan was approved by home office, as well as making the loan more attractive to sell to

17    investors. For example, employees would double the appraised value of the borrower's home on

18    the loan application."

19         i.    "On several occasions, I witnessed [Ameriquest employees] tell borrowers

20    the amount of income to write in the borrower's Stated Income statement for purposes of a stated

21    income loan. This number would bear no relationship with what the borrower may actually have

22    been making; rather, the borrower was told that they would need to state an income at the

23    instructed level in order to get the loan. Borrowers were not asked to be nor encouraged to be

24    truthful in this."

25    97.    On information and belief, several employees in the San Mateo office have been

26    arrested and/or fired for fraud and/or predatory lending practices, yet Ameriquest has not taken

27    adequate measures, if any measures, to investigate or remedy the harms caused to borrowers by

28    those employees.

## DEFENDANTS' PREDATORY AND DISCRIMINATORY LENDING TACTICS

98.     Defendants aggressively solicit low-income borrowers to enter into refinancing and other residential real estate transactions involving principal amounts that exceed the borrowers' ability to repay.  From the outset, Defendants anticipate these transactions may lead to default and foreclosure.  Defendants remain unconcerned, however, because they obtain exorbitant fees up-front and unconscionable interest rates in the interim, making the transactions much more profitable than conventional mortgages.

99.     Defendants unfairly and unlawfully obtain origination fees, excessive interest payments and prepayment penalties by extending loans to consumers, including Plaintiffs and Class Members, for which they do not qualify and cannot afford.  Defendants often achieve this unlawful result by falsifying borrowers' income on mortgage applications, without the borrowers' knowledge or consent.

100.     Defendants mislead and harm unsuspecting consumers by inducing them to enter into inappropriate loans that saddle them with monthly payments that, when compared to their income, they are unlikely to be able to pay.

101.     Defendants employ "bait and switch" tactics to induce borrowers into entering predatory loans. To lure borrowers in, Defendants promise loans with "no costs" up front, fixed interest rates, all-inclusive low monthly payments and/or particular fees and interest rates.  When the paperwork is presented to the customers for signature, however, the terms are different from those promised, with huge up-front costs, variable interest rates instead of fixed rates, monthly payments that are more than previously promised, monthly payments that do not include taxes and insurance, and/or higher fees or interest rates than previously represented.  Borrowers frequently are unaware that the terms of the mortgage contract do not match Defendants' prior representations.  Sometimes borrowers discover the discrepancies before entering the loans, but are pressured by Defendants' manipulative and deceptive practices to enter the loans anyway.  Other times borrowers do not discover the changed terms until after they have signed the loan papers, sometimes months or years later when advised by an attorney.

102.   Defendants or their agents mislead the borrowers into signing loan documents without reading them by misrepresenting their contents and telling borrowers there is no need or time to read them—just "sign here"—or, in the case of non-English readers, by failing to provide a translation the borrower can read.

103.   Defendants often hide the fact that a loan has an adjustable rate and that the monthly payments will greatly increase in two years, when the borrower will remain trapped in the loan by a huge three-year prepayment penalty.

104.   While Defendants purport to provide a three-day (or sometimes a seven-day) right of rescission, they fail to effectively notify borrowers of this right and often defeat it altogether by failing to provide a true copy of the loan papers to the borrower until after the loan has funded. By these and other unlawful tactics, including falsifying borrowers' income without their knowledge or consent, Defendants qualify the borrowers for loans with predatory rates, terms and conditions, and induce them to go forward with the transactions.

105.   In dealing with Plaintiffs and Class Members, Defendants emphasize low monthly payment amounts when discussing the price of the loan, rather than interest rate, points, or Annual Percentage Rate. Defendants also fail to mention to borrowers that these "low monthly payments" will dramatically increase after a short period of time. These methods have allowed Defendants to present terms and conditions that appeared to be favorable to Plaintiffs and Class Members, but in fact cost considerably more than is necessary or appropriate to obtain the loan.

106.   Plaintiffs are informed and believe, and on that basis allege, that Defendants and their agents mislead borrowers to believe that their credit ratings were lower than they in fact are, telling borrowers that the high-rate loan being offered was the best deal that someone with their credit rating could get.

107.   As part and parcel of their Predatory Lending Practices, Defendants fail to provide required disclosures—including, but not limited to, the HUD-1 statement, Notice of Right to Cancel, a "good faith" Good Faith Estimate, settlement process information booklet and all other disclosures required under TILA and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* —to Plaintiffs and Class Members and misled them as to the true terms and costs

Page  79   Exhibit  5

1    of their loan transactions.  Defendants instructed Plaintiffs and Class Members to sign as

2    indicated on the mortgage applications and contracts, without providing them an opportunity to

3    review the papers, and while misrepresenting their contents as alleged above.  Additionally, in the

4    case of Plaintiffs and Class Members that are illiterate in English, Defendants failed to inform or

5    provide translations of the contents of the mortgage applications and contracts—thus making any

6    and all required disclosures ineffective.

7        108.    Defendants' Predatory Lending Practices include oppressive and harassing

8    marketing techniques to induce consumers to enter into loan transactions.  Defendants' high-

9    pressure marketing and sales schemes have been implemented through, among other means,

10   standardized training, conditioning and oral scripts, telemarketing, direct mailings, and uniform

11   business contracts and forms.  Defendants have developed and implemented a misleading sales

12   approach or "sales pitch" used by Defendants' agents and employees when soliciting potential or

13   existing borrowers.  A frequent false claim by sales personnel is that certain terms are "standard"

14   and cannot be changed.  Plaintiffs and Class Members have been bombarded by mailers,

15   telephone calls and personal visits by Defendants' sales personnel inviting them to "consolidate

16   their debts" or obtain money for remodeling through residential equity loans and refinancing

17   transactions, all under the misleading pretext that such loans are at truly "no cost" and will enable

18   consumers to reduce their monthly payments.

19       109.    Defendants' advertising and marketing materials are false and misleading.

20   Defendants use these materials to induce consumers to enter into residential real estate loan

21   transactions that were financially detrimental to those consumers and known by Defendants to be

22   unconscionable, especially when compared to the risks involved and the income of the borrowers.

23       110.    Ameriquest's marketing and advertising materials falsely state that it will abide by

24   a certain standard of conduct and that the loans will be tailored to meet the needs of the borrower

25   at reasonable rates, as set forth in the "Best Practices" quoted above.  As herein alleged, the

26   representations contained in the "Best Practices" advertisement and other similar advertisements

27   disseminated by Defendants were and are materially false and/or misleading.

28       111.    Defendants have targeted these sales tactics at the elderly, minorities, women and

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    27

1   low-income neighborhoods, and continue to do so.

2        112.   Defendants offer consumers who are elderly, of minority race or national origin

3   loans, and or female with substantially less favorable terms than those offered by Defendants to

4   non-seniors, Caucasians, natural-born American citizens and males.

5        113.   Plaintiffs are informed and believe, and on that basis allege, that Defendants'

6   conduct, as herein alleged, is part of a pattern and practice of predatory lending that discriminates

7   against low-income borrowers on the basis of age, race, national origin and/or gender.

8        114.   Plaintiffs are informed and believe, and on that basis allege, that Defendants

9   frequently falsify borrowers' race or nationality in loan contracts—*e.g.*, attesting that borrowers

10   known to be African-American are Caucasian—in order to distort the data Defendants are

11   required to report to HUD pursuant to the Home Mortgage Data Act, and thereby hide statistical

12   evidence of Defendants' discriminatory loan pricing and terms.

13        115.   Defendants have willfully and maliciously engaged in Predatory Lending Practices

14   for over ten years.  Despite entering into the settlement agreements with the DOJ in 1996 and

15   ACORN in 2000, and being sued dozens of times for Predatory Lending Practices, Defendants

16   refuse to cease their pattern and practice of predatory and discriminatory lending.

17   
18   **DEFENDANTS' CONDUCT TOWARD THE NAMED PLAINTIFFS<br>TYPIFIES DEFENDANTS' WRONGFUL CONDUCT**

19   I.    **Plaintiff Nona Knox**

20        116.   Plaintiff Nona Knox ("Mrs. Knox") is a 69 year-old African-American woman

21   who owns and resides in a house in East Palo Alto.  At the time of the events described herein,

22   she was caring for her elderly husband, Albert Knox ("Mr. Knox"), who was suffering from

23   cancer.  Mr. Knox passed away in September 2004.  Mrs. Knox maintains this action on her own

24   behalf and on the behalf of her husband's estate.

25        117.   In early 2002, Mrs. Knox responded by telephone to an unsolicited advertisement

26   mailed to her by Ameriquest.  Ameriquest made an appointment with Mrs. Knox and sent two

27   men, Richard Valle ("Valle") and another Ameriquest agent, to the Knox home.  Mrs. Knox

28   informed Valle that she and her husband wanted to refinance their home to pay off credit cards

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC       28

1    and a car loan and to obtain money to remodel their bathroom.

2        118.    Mrs. Knox showed Valle their then current mortgage terms and said that she

3    wanted to refinance at a fixed rate. To the best recollection of Mrs. Knox, Valle responded, "We

4    can do better," and asked Mrs. Knox and her husband their ages. Mrs. Knox was 66 at the time;

5    Mr. Knox was 79.

6        119.    Valle filled out the entire loan application for Mrs. Knox. He did not have Mr. or

7    Mrs. Knox write down any information. Rather, in response to Valle's questions about the

8    Knoxes' income and assets, Mrs. Knox provided Valle with bank statements, social security

9    check stubs, and pension information, which together documented a monthly income of

10   approximately $4,000. The loan application, however, lists the Knoxes' monthly income as

11   $6,800. This false amount was inserted into the mortgage application without the knowledge or

12   consent of Mr. or Mrs. Knox.

13       120.    Valle also told Mrs. Knox that the loan would be at "no cost" to them, and

14   promised that they would receive $20,000 cash back for the bathroom remodel.

15       121.    Mrs. Knox asked Valle whether he was offering the best rate. To Mrs. Knox's

16   best recollection, Valle responded, "I'm giving you the lowest possible rate for a person your

17   age."

18       122.    Valle and the other Ameriquest agent returned to the Knox home on May 13,

19   2002, to complete the signing of the loan contract. The contract was dated May 10, 2002. Valle

20   did not give Mrs. Knox an opportunity to read even a single page of the loan contract; instead, he

21   flipped through the contract page by page while substantially stating, "this is for [purported

22   purpose of the page], sign here." Some of the pages were blank. When Mrs. Knox inquired why

23   she and her husband needed to sign blank pages, Valle responded, to the best of Mrs. Knox's

24   recollection, "You just need to sign these to get things done."

25       123.    At the May 13 signing, the loan contract presented to Mr. And Mrs. Knox by Valle

26   and the other Ameriquest agent included a blank Notice of Right to Cancel dated May 10, 2002.

27   This notice was ineffective since Defendants failed to fill in both the "signing date" and the "final

28   date to cancel." Furthermore, even had this information been included, the notice still would

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    29

1    have been ineffective since Valle did not leave any copy of the notice with the Knoxes.

2        124.    A notary brought to the Knox home by Valle and the other Ameriquest agent took

3    Mr. and Mrs. Knox's fingerprints, checked their identification, and signed and stamped the notary

4    book. However, a notary stamp does not appear anywhere on the purported copy of the loan

5    contract later provided to the Knoxes.

6        125.    Valle did not leave a copy of the loan contract or any other papers with Mrs. Knox,

7    nor did he say anything to her about points, fees, or the insufficiency of income.

8        126.    Valle did not tell Mr. or Mrs. Knox that the loan contract—which was based on the

9    loan application filled out by Valle—falsely stated that the Knoxes' monthly income was $6,800

10    and that Mr. Knox was self-employed by the "Knox Music Academy," a fictitious entity

11    purportedly operating at the Knox home address. Mr. and Mrs. Knox did not know that this

12    fictitious income from a fictitious business was included in the loan contract and did not suggest

13    or consent to it. Mr. Knox was not a music teacher of any kind. Indeed, at the time of the loan

14    application and contract signing, Mr. Knox was suffering from terminal cancer and related

15    medical conditions, and was unable to tend to rudimentary daily activities without the assistance

16    of Mrs. Knox.

17        127.    Ameriquest did not provide Mr. or Mrs. Knox with possession of the loan

18    documents until after the loan had been approved, at which time Valle returned to the Knox home

19    with a disbursement check. The check was for only approximately $8,000, even though Valle

20    had promised the Knoxes that they would receive approximately $20,000 in cash. According to

21    Valle, the discrepancy was due to Mr. and Mrs. Knox needing to pay off more bills.

22        128.    Unbeknownst to Mr. and Mrs. Knox, the loan was "bought down" from 12.5% to

23    8.252% fixed APR at a cost of $14,875, which was added to the loan principal without the

24    knowledge or consent of Mr. or Mrs. Knox. The Knoxes also paid $2,726 in closing costs. The

25    Knoxes' total settlement charges were $18,716, despite having been told that the loan would be at

26    "no cost" to them.

27        129.    At the time the Knoxes entered the loan contract with Ameriquest in 2002—when

28    mortgage rates were at historical lows—the Knoxes had good credit and could have qualified for

1    a prime mortgage.

2    **II.    Plaintiff Maria Torres**

3        130.    In late 2002, Plaintiff Maria Torres ("Mrs. Torres"), a Hispanic woman, received

4    an unsolicited phone call from an Ameriquest agent, Jesùs Elizalde ("Elizalde"), urging her to

5    refinance her then current mortgage. Mrs. Torres was not prepared to commit, and while she

6    remained undecided Elizalde repeatedly called her to urge her to refinance.

7        131.    After Elizalde convinced her to refinance, Mrs. Torres traveled to his office to

8    provide information. During this meeting all discussions regarding the loan took place in

9    Spanish, as Mrs. Torres does not speak English.

10        132.    During the first meeting, Elizalde had Mrs. Torres sign various papers. He did not

11    inform Mrs. Torres about the contents of the papers or their purpose. Mrs. Torres did not read or

12    fill out any paperwork, nor could she, as she is illiterate in English. Mrs. Torres informed

13    Elizalde that her monthly income was approximately $1,700 and that she occasionally received

14    approximately $500 in gifts from her children. Mrs. Torres provided pay stubs from her janitorial

15    job and other basic information to Elizalde. The loan application, however, lists Mrs. Torres'

16    monthly income as $4,500—an amount inserted into the mortgage application without Mrs.

17    Torres' knowledge or consent. No information was provided regarding Mrs. Torres' husband or

18    his income.

19        133.    Approximately one month later, Elizalde told Mrs. Torres to come back to his

20    office to complete the transaction. Mrs. Torres returned to Elizalde's office. Elizalde requested

21    that Mrs. Torres sign various documents; she signed where Elizalde indicated, but could not read

22    the documents to confirm their contents because all were in English. Elizalde did not inform Mrs.

23    Torres of the contents of the documents. Elizalde never told Mrs. Torres whether the interest rate

24    was fixed or variable, that there were prepayment penalties and broker fees, or that her income

25    had been falsified.

26        134.    The loan contract dated December 21, 2002 presented to Mrs. Torres for signature

27    included a Notice of Right to Cancel. This notice was ineffective since Defendants failed to fill

28    in both the "signing date" and the "final date to cancel." Furthermore, even had this information

1  been included, the notice still would have been ineffective since the document was in English.

2  Finally, even had Defendants presented a Spanish-translation copy to Mrs. Torres at the signing,

3  the notice still would have been ineffective because Defendants did not leave a copy with Mrs.

4  Torres.

5  **III.    Plaintiffs Heladio Arellanes and Maria Arellanes**

6       135.    Plaintiffs Heladio Arellanes and Maria Arellanes ("Mr. and Mrs. Arellanes"), a

7  Hispanic couple, were referred to Argent's agent, Rogelio Mota ("Mota"), by a neighbor. All

8  meetings and conversations took place in Spanish, as Mr. and Mrs. Arellanes do not speak

9  English.

10      136.    In late 2002, Mr. and Mrs. Arellanes went to Mota's office and informed him that

11  they were interested in refinancing their then current mortgage because they had a high interest

12  rate. Mr. and Mrs. Arellanes specifically requested a loan with a lower interest rate, and that

13  included taxes and insurance. This first meeting lasted only fifteen minutes. Mr. and Mrs.

14  Arellanes gave Mota copies of their then current mortgage papers, pay stubs and bank statements.

15  Mr. and Mrs. Arellanes did not fill out or sign any paperwork.

16      137.    Mota contacted Mr. and Mrs. Arellanes approximately thirty days later and

17  informed them that the loan had been approved. He asked them to come by his office to sign the

18  forms. The loan application falsely lists Mr. and Mrs. Arellanes' monthly income as $4,761.

19  Neither Mr. nor Mrs. Arellanes had knowledge of this misstatement of income nor suggested or

20  consented to it.

21      138.    During the second meeting at Mota's office, Mota told Mr. and Mrs. Arellanes

22  where to sign the documents, without providing any translation or information regarding their

23  contents. The documents were entirely in English. Mr. and Mrs. Arellanes could not read the

24  documents as they are illiterate in English. Mota's only explanation regarding the documents was

25  to promise Mr. and Mrs. Arellanes that their monthly payments would be lower.

26      139.    Specifically, Mota never informed Mr. and Mrs. Arellanes, *inter alia*, that the

27  interest rate on the new loan was variable as opposed to fixed; that there was a prepayment

28  penalty; that their income had been falsified; or that they had a right to rescind or cancel the

1  contract before a certain date. Mota gave Mr. and Mrs. Arellanes an unsigned copy of the

2  documents, but only in English.

3      140.    The loan contract dated January 15, 2003 presented to Mr. and Mrs. Arellanes for

4  signature included a blank Notice of Right to Cancel. This notice was ineffective, however, since

5  Defendants failed to fill in both the "signing date" and the "final date to cancel." Furthermore,

6  even had this information been included, the notice still would have been ineffective since the

7  document was in English. Finally, the notice was ineffective because Defendants did not leave a

8  copy with them.

9                          **CAUSES OF ACTION**

10
                          **FIRST CAUSE OF ACTION**
11  **Violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* and
    Federal Reserve Regulation Z, 12 C.F.R. § 226.1 *et seq.*
12                          (Against All Defendants)**

13      141.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

14  140, inclusive, as if fully set forth herein.

15      142.    Defendants Ameriquest and Argent are creditors within the meaning of the Truth

16  in Lending Act ("TILA") as implemented by Regulation Z.

17      143.    Defendants violated TILA and Regulation Z by:

18          a.    Failing to provide Plaintiffs and Class Members with material disclosures

19  in a form they could keep prior to consummation; and

20          b.    Failing to provide Plaintiffs and Class Members with notices of right to

21  cancel that were clear, conspicuous, and reflective of the parties' legal obligations.

22      144.    Any and all statute of limitations relating to disclosures and notices required under

23  15 U.S.C. section 1601 *et seq.* are tolled due to the Defendants' failure to effectively provide the

24  disclosures and notices.

25      145.    An actual controversy exists, as Plaintiffs and Class Members believe they have

26  the right to rescind their loans with Defendants, but Defendants deny that right.

27      146.    As a direct and proximate result of these violations, Plaintiffs and Class Members

28  were and continue to be damaged in a sum according to proof, not yet ascertained, including, but

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    33                    Page  76    Exhibit 5

1    not limited to, statutory damages and all amounts paid or to be paid to Defendants, excluding

2    principal payments.

3         147.    Defendants have been unjustly enriched at the expense of the Plaintiffs and Class

4    Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

5    by Defendants.

6         148.    The acts of Defendants as described herein were willful, wanton and in conscious

7    disregard of Plaintiffs' and Class Members' rights. Accordingly, Plaintiffs and Class Members

8    are entitled to recover punitive damages in an amount to be established at trial.

9         WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

10
11   **SECOND CAUSE OF ACTION**<br>**Violation of the Fair Housing Act**<br>**42 U.S.C. § 3601 *et seq*.**<br>**(Against All Defendants)**
12

13        149.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

14   148, inclusive, as if fully set forth herein.

15        150.    Defendants Ameriquest and Argent are entities that engage in transactions related

16   to residential real estate, and the loans made by Defendants to Plaintiffs and Class Members, as

17   alleged herein, were such transactions.

18        151.    Plaintiffs and Class Members are minorities.

19        152.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

20   engaged in a willful and malicious pattern and practice of discrimination against them and Class

21   Members, on the basis of their race and/or gender, in the terms and conditions of the loan

22   contracts entered into between Plaintiffs and Class Members, on the one hand, and Defendants,

23   on the other.

24        153.    Defendants have been challenged before for violating 42 U.S.C. section 3601 *et*

25   *seq*., but have willfully and maliciously failed to take effective remedial measures.

26        154.    Plaintiffs and Class Members have been and continue to be damaged as a result of

27   Defendants' discriminatory conduct. Plaintiffs and Class Members are entitled to an order of this

28   Court enjoining Defendants from continuing to engage in such discriminatory conduct. Plaintiffs,

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                              34

1    Class Members, and the general public will be irreparably harmed if such an order is not granted.

2        155.    Defendants have been unjustly enriched at the expense of the Plaintiffs and Class

3    Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

4    by Defendants.

5        156.    The acts of Defendants as described herein were willful, wanton and in conscious

6    disregard of Plaintiffs' and Class Members' rights.  Accordingly, Plaintiffs and Class Members

7    are entitled to recover punitive damages in an amount to be established at trial.

8        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

9
                    **THIRD CAUSE OF ACTION**
10                **Violation of the Equal Credit Opportunity Act**
                    **15 U.S.C. § 1691 *et seq.***
11                    **(Against All Defendants)**

12        157.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

13    156, inclusive, as if fully set forth herein.

14        158.    Defendants Ameriquest and Argent are creditors within the meaning of 15 U.S.C.

15    section 1691(e).

16        159.    The loan contracts that Plaintiffs and Class Members entered into with Defendants

17    were credit transactions.

18        160.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

19    engaged in a willful and malicious pattern and practice of discrimination against them and Class

20    Members, on the basis of race, national origin, age and/or gender, in the terms and conditions of

21    the loan contracts entered into between Plaintiffs and Class Members, on the one hand, and

22    Defendants, on the other.

23        161.    Defendants have been challenged before for violating 15 U.S.C. section 1691 *et*

24    *seq.*, but have willfully and maliciously failed to take effective remedial measures.

25        162.    Plaintiffs and Class Members have been and continue to be damaged as a result of

26    Defendants' discriminatory conduct.  Plaintiffs and Class Members are entitled to an order of this

27    Court enjoining Defendants from continuing to engage in such discriminatory conduct.  Plaintiffs,

28    Class Members, and the general public will be irreparably harmed if such an order is not granted.

1    163.    Defendants have been unjustly enriched at the expense of the Plaintiffs and Class

2    Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

3    by Defendants.

4    164.    The acts of Defendants as described herein were willful, wanton and in conscious

5    disregard of Plaintiffs' and Class Members' rights.  Accordingly, Plaintiffs and Class Members

6    are entitled to recover punitive damages in an amount to be established at trial.

7    WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

8    **FOURTH CAUSE OF ACTION**
**Violation of the Fair Employment and Housing Act**
9    **California Gov. Code § 12900 *et seq.***
**(Against All Defendants)**
10

11    165.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

12    164, inclusive, as if fully set forth herein.

13    166.    Defendants Ameriquest and Argent are financial institutions that provide financial

14    assistance for the purchase of housing within the meaning of California Government Code section

15    12955(e).

16    167.    Plaintiffs and Class Members are women, racial minorities and/or persons of

17    foreign national origin who entered loan transactions with Defendants.

18    168.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

19    engaged in a willful and malicious pattern and practice of discrimination against Plaintiffs and

20    Class Members, on the basis of their gender, race and/or national origin in the terms or conditions

21    of the loan contracts entered into between Plaintiffs and Class Members, on the one hand, and

22    Defendants, on the other.  Specifically, the terms and conditions offered to Plaintiffs and Class

23    Members were less favorable than those offered by Defendants to borrowers not better qualified

24    than Plaintiffs and Class Members but of different gender, race and/or national origin.

25    169.    Defendants have been challenged several times in the past ten years under federal

26    laws for engaging in unlawful discrimination that violates California Government Code section

27    12900 *et seq.*, but have willfully and maliciously failed to take effective remedial measures.

28    170.    Plaintiffs and Class Members have been and continue to be damaged as a result of

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    36

1    Defendants' discriminatory conduct. Plaintiffs and Class Members are entitled to an order of this

2    Court enjoining Defendants from continuing to engage in such discriminatory conduct. Plaintiffs,

3    Class Members, and the general public will be irreparably harmed if such an order is not granted.

4         171.    Defendants have been unjustly enriched at the expense of the Plaintiffs and Class

5    Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

6    by Defendants.

7         172.    The acts of Defendants as described herein were willful, wanton and in conscious

8    disregard of Plaintiffs' and Class Members' rights. Accordingly, Plaintiffs and Class Members

9    are entitled to recover punitive damages in an amount to be established at trial.

10        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

11
                                **FIFTH CAUSE OF ACTION**
12                      **Violation of the Unruh Civil Rights Act**
                              **California Civil Code § 51**
13                            **(Against All Defendants)**

14        173.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

15    172, inclusive, as if fully set forth herein.

16        174.    Plaintiffs are informed and believe, and on that basis allege, that Defendants have

17    engaged in a willful and malicious pattern and practice of discrimination against them and Class

18    Members, on the basis of race, national origin, and/or gender, in the terms and conditions of the

19    loan contracts entered into between Plaintiffs and Class Members, on the one hand, and

20    Defendants, on the other. Specifically, the terms and conditions offered to Plaintiffs and Class

21    Members were less favorable than those offered by Defendants to borrowers not better qualified

22    than Plaintiffs and Class Members but of different race, national origin and/or gender.

23        175.    Defendants have been challenged several times before under federal laws for

24    engaging in unlawful discrimination that violates California Civil Code section 51 *et seq.*, but

25    have willfully and maliciously failed to take effective remedial measures.

26        176.    Plaintiffs and Class Members have been and continue to be damaged as a result of

27    Defendants' discriminatory conduct. Plaintiffs and Class Members are entitled to an order of this

28    Court enjoining Defendants from continuing to engage in such discriminatory conduct. Plaintiffs,

1    Class Members, and the general public will be irreparably harmed if such an order is not granted.

2         177.    Defendants have been unjustly enriched at expense at Plaintiffs and Class

3    Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

4    by Defendants.

5         WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

6                        **SIXTH CAUSE OF ACTION**
                    **Violation of the Unfair Competition Act**
7         **California Business and Professions Code § 17200 *et seq.***
                        **(Against All Defendants)**
8

9         178.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

10   177, inclusive, as if fully set forth herein.

11        179.    Plaintiffs and Class Members are informed and believe, and on that basis allege,

12   that Defendants have been engaged in, and continue to engage in, numerous acts and/or a pattern

13   and practice of unfair competition within the state of California in violation of Business and

14   Professions Code section 17200 *et seq.* and similar sister-state statutes proscribing deceptive

15   business practices.  These unfair business practices include without limitation the following:

16        a.    Engaging in Predatory Lending Practices in dealings with Plaintiffs and

17   Class Members;

18        b.    Failing to provide notices and disclosures required by the Truth in Lending

19   Act and the Real Estate Settlement Procedures Act;

20        c.    Discriminating on the basis of race, national origin, gender and/or age; and

21        d.    Violating the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; the Fair

22   Housing Act, 42 U.S.C. § 3601 *et seq.*; the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et*

23   *seq.*; the Unruh Civil Rights Act, California Civil Code § 51 *et seq.*; the Fair Employment and

24   Housing Act, California Government Code § 12900 *et seq.*; the Consumers Legal Remedies Act,

25   California Civil Code section 1750 *et seq.*; the Unfair Competition Act, California Business and

26   Professions Code section 17200 *et seq.*; the False Advertising Act, California Business and

27   Professions Code section 17500 *et seq.*; or any other applicable statute.

28        180.    The above-described unlawful, unfair and fraudulent business practices present an

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC              38

1   ongoing threat of injury to Plaintiffs, Class Members and the general public.  Plaintiffs, Class

2   Members and the general public continue to be financially harmed by such conduct and, unless

3   restrained, Defendants will continue to engage in such conduct.

4       181.   Pursuant to California Business and Professions Code section 17203 and similar

5   state statutes, Plaintiffs and Class Members are entitled to an order of this Court enjoining

6   Defendants from continuing to engage in unfair competition as defined in Business and

7   Professions Code section 17200 in the State of California and similar statutes of sister-states.

8   Plaintiffs, Class Members, and the general public will be irreparably harmed if such an order is

9   not granted.

10      182.   Defendants have been unjustly enriched at the expense of the Plaintiffs and Class

11  Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

12  by Defendants.

13      WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

14
            **SEVENTH CAUSE OF ACTION**
            **Violation of the False Advertising Act**
15          **California Business and Professions Code § 17500 *et seq.***
            **(Against All Defendants)**
16

17      183.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

18  182, inclusive, as if fully set forth herein.

19      184.   The advertising, promotional materials and other written and oral promotional

20  efforts undertaken by Defendants to induce consumers to enter into loan transactions contained

21  statements that were deceptive, untrue and/or misleading, or omitted material information, and

22  which were known, or by the exercise of reasonable care should have been known, by Defendants

23  to be deceptive, untrue and/or misleading, in violation of California Business and Professions

24  Code section 17500 *et seq.* and similar sister-state statutes proscribing false advertising.

25      185.   Defendants' use of various forms of advertising media to advertise, call attention

26  to or give publicity to the sale of their goods and services, and other practices, as set forth above,

27  which were not as advertised or as otherwise represented, constituted unfair competition;

28  deceptive, untrue and/or misleading advertising; and unlawful business practice within the

1   meaning of California Business and Professions Code sections 17200 *et seq.* and 17500 *et seq.*

2   These advertisements and practices have deceived and are likely to deceive the consuming public

3   in violation of those sections.

4        186.   Pursuant to California Business and Professions Code sections 17203 and 17535,

5   Plaintiffs and Class Members, individually and on behalf of the public, seek an order of this Court

6   enjoining Defendants from continuing to engage in their false advertising practices. The public,

7   Plaintiffs and Class Members will be irreparably harmed if such an order is not granted.

8        187.   Defendants have been unjustly enriched at the expense of the Plaintiffs and Class

9   Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

10   by Defendants as a result of their unfair, unlawful, deceptive, untrue and/or misleading

11   advertising practices.

12        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

13   **EIGHTH CAUSE OF ACTION**
14   **Violation of the Consumer Legal Remedies Act**
     **California Civil Code § 1750 *et seq.***
15   **(Against All Defendants)**

16        188.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

17   187, inclusive, as if fully set forth herein.

18        189.   By their wrongful conduct as alleged herein, Defendants willfully and maliciously

19   created, engaged in and/or participated in unfair acts or practices in violation of the Consumers

20   Legal Remedies Act, California Civil Code section 1750 *et seq.*, and similar sister-state statutes.

21        190.   By their conduct, Defendants engaged in unfair or deceptive acts or practices in

22   transactions intended to result in the sale of goods or services in violation of California Civil

23   Code section 1770, including but not limited to:

24        a.   Representing that their goods or services have characteristics, uses, or

25   benefits which they do not have, in violation of section 1770(a)(5);

26        b.   Advertising goods or services with intent not to sell them as advertised, in

27   violation of section 1770(a)(9); and/or

28        c.   Representing that the subject of a transaction has been supplied in

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    40

Page _93_   Exhibit _5_

1   accordance with a previous representation when it has not, in violation of section 1770(a)(16).

2       191.    Plaintiffs and Class Members have as a direct and proximate result of Defendants'

3   unfair or deceptive acts or practices suffered and continue to suffer damages in a sum according

4   to proof, not yet ascertained, including, but not limited to, all amounts paid or to be paid to

5   Defendants by Plaintiffs and Class Members, excluding principal payments.

6       192.    Defendants have been unjustly enriched at the expense of the Plaintiffs and Class

7   Members, who therefore are entitled to equitable restitution and disgorgement of profits realized

8   by Defendants as a result of their violations of the Act.

9       193.    Pursuant to section 1780, Plaintiffs and Class Members are entitled to an order of

10  this court enjoining Defendants from engaging in their unfair methods of competition or unfair or

11  deceptive acts or practices, as alleged herein.

12      194.    The acts of Defendants as described herein were willful, wanton and in conscious

13  disregard of Plaintiffs' and Class Members' rights.  Accordingly, Plaintiffs and Class Members

14  are entitled to recover punitive damages in an amount to be established at trial.

15      WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

16                          **NINTH CAUSE OF ACTION**
                               **Negligent Training**
17                          **(Against All Defendants)**

18      195.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

19  194, inclusive, as if fully set forth herein.

20      196.    Defendants owed Plaintiffs and Class Members a duty of reasonable care to train

21  their employees and agents to comply with all applicable laws, rules and/or regulations and in

22  accordance with professional, industry-wide best practices standards.  These laws, rules,

23  regulations and industry-wide best practices standards were enacted to protect individuals such as

24  Plaintiffs and Class Members.

25      197.    Defendants breached their duty to Plaintiffs and Class Members by failing to

26  adequately train their employees and agents to comply with professional, industry-wide best

27  practices standards and by allowing their employees and agents to operate without such adequate

28  training.  Moreover, Defendants' conduct fell below the standard of care as they trained and/or

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    41

1    actively encouraged their employees and agents to act in violation of applicable laws, rules and/or

2    regulations and professional, industry-wide best practices standards.  Defendants failed to take

3    reasonable steps to protect Plaintiffs and Class Members though they knew or had reason to know

4    that their failure to adequately train their employees and/or agents would result in the detriment of

5    Plaintiffs and Class Members.

6        198.    As a proximate cause of Defendants' conduct, Plaintiffs and Class Members

7    suffered damages according to proof.

8        199.    Defendants' negligent training was willful, wanton and in conscious disregard of

9    Plaintiffs' and Class Members' rights.  Accordingly, Plaintiffs and Class Members are entitled to

10    recover punitive damages in an amount to be established at trial.

11        WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

12                        **TENTH CAUSE OF ACTION**
                          **Negligent Supervision**
13                        **(Against All Defendants)**

14        200.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

15    199, inclusive, as if fully set forth herein.

16        201.    Defendants owed Plaintiffs and Class Members a duty of reasonable care that

17    required Defendants to supervise and ensure that their employees and agents complied with all

18    applicable laws, rules and regulations and in accordance with professional, industry-wide best

19    practices standards.  These laws, rules, regulations and industry-wide best practices standards

20    were enacted to protect individuals such as Plaintiffs and Class Members.  Defendants knew or

21    had reason to know that their employees and agents had engaged in past and ongoing improper

22    conduct on behalf of Defendants to the detriment of Defendants' customers and that Defendants'

23    employees and agents posed a reasonably foreseeable threat to Plaintiffs absent adequate

24    supervision, control or regulation.

25        202.    Defendants breached their duty to Plaintiffs and Class Members by failing to

26    adequately and properly supervise, control or regulate their employees and agents to preclude

27    them from engaging in the unlawful conduct described hereinabove, or otherwise to take

28    reasonable steps to protect Plaintiffs.

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    42

1    203.    As a proximate cause of the Defendants' conduct, Plaintiffs and Class Members

2    suffered damages according to proof.

3    204.    Defendants' negligent supervision was willful, wanton and in conscious disregard

4    of Plaintiffs' and Class Members' rights.  Accordingly, Plaintiffs and Class Members are entitled

5    to recover punitive damages in an amount to be established at trial.

6    WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

7    **PRAYER FOR RELIEF**

8    Plaintiffs and Class Members respectfully pray for the following relief:

9    1.    Certification of a class.

10    **First Cause of Action: Violation of the Truth in Lending Act**

11    2.    Actual damages;

12    3.    Declaratory judgment declaring Plaintiffs and Class Members the right to

13    rescind their loan contracts with Defendants;

14    4.    Disgorgement of profits;

15    5.    Restitution;

16    6.    Attorneys' fees and costs pursuant to 15 U.S.C. § 1640(a)(3); and

17    7.    Any other relief the court deems proper.

18    **Second Cause of Action: Violation of the Fair Housing Act**

19    8.    Actual damages;

20    9.    Disgorgement of profits;

21    10.    Restitution;

22    11.    Punitive damages;

23    12.    Injunctive relief;

24    13.    Attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

25    14.    Any other relief the court deems proper.

26    **Third Cause of Action: Violation of the Equal Credit Opportunity Act**

27    15.    Actual damages;

28    16.    Disgorgement of profits;

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                43

1    17.    Restitution;

2    18.    Punitive damages;

3    19.    Injunctive relief;

4    20.    Attorneys' fees and costs pursuant to 15 U.S.C. § 1691e(c); and

5    21.    Any other relief the court deems proper.

6    **Fourth Cause of Action: Violation of the Fair Employment and Housing Act**

7    22.    Actual damages;

8    23.    Pain and suffering;

9    24.    Disgorgement of profits;

10    25.    Restitution;

11    26.    Punitive damages;

12    27.    Injunctive relief;

13    28.    Attorneys' fees and costs pursuant to Cal. Gov. Code § 12989.2; and

14    29.    Any other relief the court deems proper.

15    **Fifth Cause of Action: Violation of the Unruh Civil Rights Act**

16    30.    Actual damages;

17    31.    Disgorgement of profits;

18    32.    Restitution;

19    33.    Statutory treble damages pursuant to Cal. Civ. Code § 52(a);

20    34.    Injunctive relief;

21    35.    Attorneys' fees and costs pursuant to Cal. Civ. Code § 52(a); and

22    36.    Any other relief the court deems proper.

23    **Sixth Cause of Action: Violation of the Unfair Competition Act**

24    37.    Restitution;

25    38.    Disgorgement of profits

26    39.    Injunctive relief;

27    40.    Any other relief the court deems proper.

28

FIRST AMENDED COMPLAINT
CASE NO. C 05 00240 SC                    44

1  **Seventh Cause of Action: Violation of the False Advertising Act**

2        41.   Disgorgement of profits;

3        42.   Restitution;

4        43.   Injunctive relief;

5        44.   Any other relief the court deems proper.

6  **Eighth Cause of Action: Violation of the Consumer Legal Remedies Act**

7        45.   Actual damages;

8        46.   Restitution;

9        47.   Punitive damages;

10        48.   Injunctive relief;

11        49.   Attorneys' fees and costs pursuant to Cal. Civ. Code § 1780(d); and

12        50.   Any other relief the court deems proper.

13  **Ninth Cause of Action: Negligent Training**

14        51.   Actual damages;

15        52.   Restitution;

16        53.   Punitive damages;

17        54.   Injunctive relief; and

18        55.   Any other relief the court deems proper.

19  **Tenth Cause of Action: Negligent Supervision**

20        56.   Actual damages;

21        57.   Restitution;

22        58.   Punitive damages;

23        59.   Injunctive relief; and

24        60.   Any other relief the court deems proper.

25  Dated: March 8, 2005        FENWICK & WEST LLP

26                   By:_____/s/_____

27                            Aaron Myers
                 Attorneys for Plaintiffs NONA KNOX,
                 ALBERT KNOX, MARIA TORRES, HELADIO

28                   ARELLANES AND MARIA ARELLANES

98    Exhibit    5

1

## DEMAND FOR JURY TRIAL

2          Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 30-6, Plaintiffs hereby

3    demand a trial by jury.

4

5    Dated: March 8, 2005                         FENWICK & WEST LLP

6                                                 By:_____/s/_____
                                                          Aaron Myers
7
                                                 Attorneys for Plaintiffs
8                                                NONA KNOX, ALBERT KNOX, MARIA TORRES,
                                                 HELADIO ARELLANES & MARIA ARELLANES
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715 |
| | Lead Case No. 05-cv-07097 |
| | Judge Marvin E. Aspen |
| THIS DOCUMENT RELATES TO ALL ACTIONS | Magistrate Judge Morton Denlow |

## DEFENDANTS'[1] STATUS REPORT

### I.    INTRODUCTION

Although no fewer than 450 necessary parties are not yet before the Court,[2] the existing

parties continue to cooperate with each other and actively move this Multidistrict Litigation

Proceeding ("Proceeding") forward. This Status Report informs the Court of the continued

progress and cooperation of the parties on the following discovery matters since the last status

conference on April 26, 2007:

- Production of documents;

---

[1] "Defendants" collectively refers to Ameriquest Mortgage Company; AMC Mortgage Services, Inc.; Town & Country Credit Corporation; Ameriquest Capital Corporation; Town & Country Title Services, Inc.; and Ameriquest Mortgage Securities, Inc.

[2] On March 16, 2007, Defendants were ordered to cease the filing of individual third party complaints and instead to file a consolidated third party complaint as to all pending non-class actions within 45 days of the filing of the last answer to such complaints. Since Defendants have motions to dismiss at least 100 individual complaints, the 45-day period has not yet begun to run. In addition, there are more than 20 matters currently pending before the Multidistrict Litigation Panel, which Defendants expect will ultimately be transferred to this Proceeding. Attached hereto as Exhibit A is the Multidistrict Litigation Panel's current Case Listing Report identifying the cases currently included in this proceeding and cases in various stages of the transfer process.

1

- Scheduling of Rule 30(b)(6) depositions;

- Proposed order on stipulation regarding service of deposition notices.

- Proposed order regarding mediation stipulation.

Further, with respect to the status of the settlement reached between Defendants and the
49 Attorneys General, Defendants are informed and believe that a postcard with information
about the settlement will be sent to eligible borrowers during the last week of June 2007 and that
the Notice and Release Form is expected to follow the postcard, in early July. [*See* A.G.
Settlement website www.ameriquestmultistatesettlement.com/index.html]

## II.    PRODUCTION OF DOCUMENTS

Shortly after the Court lifted the discovery stay in this multidistrict litigation proceeding,
Plaintiffs served a comprehensive set of 614 separate document requests on Defendants. The
parties continue to engage in a meaningful meet and confer process and Defendants have already
produced the following items to Plaintiffs:

- More than 56,380 pages of loan files in connection with 281 borrowers;

- More than 121,000 pages of policy, procedure and training documents;

- More than one dozen DVDs, CDs, videotapes and audiotapes of training materials.

In addition, after Defendants began a rolling production of documents, Plaintiffs requested that a
certain subgroup of documents be produced in their native format, such as Microsoft Word and
Excel, rather than in the standard PDF format. This raised various substantive and procedural
problems, including how to ensure that "live" documents are not tampered with, how to Bates
label the production and how to divide the cost of the project. In an effort to keep the production
of documents continuing, Defendants met and conferred with Plaintiffs and ultimately agreed to
produce the documents in a searchable PDF format at Defendants' expense of approximately
$10,000. Document production is ongoing.

Page 101    Exhibit 5

## III.   PROPOSED ORDERS

### A.   Deposition Procedures

All parties are endeavoring to cooperate in order to ensure that discovery proceeds in an
orderly and expeditious fashion. To this end, Defendants are producing numerous witnesses
prior to the joinder of all necessary parties. Specifically, Plaintiffs served Rule 30(b)(6)
deposition notices on various Defendants that cover a combined 163 topics. The parties have
narrowed the notices to 49 categories and have presently selected the following ranges of dates
for many of the depositions to go forward: June 11-13, 25-19 and July 9-13, 23-27. In
connection with these and other future depositions, the parties agreed to a Stipulation Regarding
Service of Deposition Notices that will help streamline the process of providing notice of the
date and time of any scheduled deposition by email to all other parties then listed in the Court's
ECF records. The parties therefore request that this Court enter the Stipulation Regarding
Service of Deposition Notices filed by the Roddy, Klein & Ryan firm on June 1, 2006.

Defendants continue to be concerned, as is this Court,[3] that later-added parties will seek
to conduct these same depositions at a later date. Although Defendants raised this concern with

---

[3] At the initial status conference, April 26, 2007, before the Honorable Magistrate Judge Morton Denlow, this Court
expressed the following concerns with respect to the taking of Rule 30(b)(6) depositions:

> Here's my thought. . . . [T]o the extent that the discovery is intended to, let's say,
> determine record management practices, those kinds of things, I don't really see that people would
> be prejudiced and asked to come in assuming, . . . it is fairly well covered and the depositions
> themselves are made available.

> I think once you get into merits type of discovery, I have a greater concern and the
> potential for prejudice may be greater when you're dealing with what I would call merits
> discovery than what I would call sort of background type discovery.

> So I'm not sure, Mr. Klein, whether . . . your 30(b)(6) notices are, you know, please
> describe your record management practices, your record keeping, you know, the compensation
> systems, you know, things of a general nature, you know, I would be more inclined to say . . . let's
> move forward with that.

> But if you get into the senior executives talking about . . . the merits and how this all
> came about, these various programs, then I would be more sensitive, I think, to the idea that let's
> be sure everybody is in there and has a chance.

Transcript of Proceedings, April 26, 2007, p. 17, line 22 - p. 18, line 18.

Page 102   Exhibit 5

the Court at the April 26th status conference, the matter remains unsettled. Now, on the eve of a significant number of depositions, Defendants renew their request that parties joined after a particular deposition has taken place be barred from retaking that witness' deposition. Attached as Exhibit B to this Report is a Proposed Order governing multiple depositions of the same witnesses that Defendants submitted at the last status conference on April 26, 2007. Defendants request that Exhibit B be entered as an order of this Court.

## B.   Stipulation Re Mediation & Discovery With Opt-Out Plaintiffs.

On January 19, 2007, Defendants and representatives of the individual plaintiffs entered into a Stipulation Re Mediation, which was previously filed as Docket No. 465 but has not yet been entered. At the April 26th status conference, Defendants submitted a copy of this Stipulation that contained deadlines that were no longer viable. At the direction of this Court, Defendants have revised Stipulation to amend stale deadlines and to add two new signatories. Defendants are circulating the revised stipulation to the parties and anticipate being able to present this Court with a Stipulation which has been agreed to by the parties.

Respectfully submitted,

DATED: June 4, 2007

By: /s/ Bernard E. LeSage

*Attorneys for Defendants Ameriquest Mortgage Company; AMC Mortgage Services, Inc.; Town & Country Credit Corporation; Ameriquest Capital Corporation; Town & Country Title Services, Inc.; and Ameriquest Mortgage Securities, Inc.*

Bernard E. LeSage, Esq.
Sarah K. Andrus, Esq.
BUCHALTER NEMER
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017-2457
Telephone: (213) 891-0700
Facsimile: (213) 896-0400

/03   Exhibit 5

## CERTIFICATE OF SERVICE

I, Bernard E. Lesage, hereby certify that on this 4th day of June 2007, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: /s/ Bernard E. LeSage

5

Page 104 Exhibit 5

1
2

**PROOF OF SERVICE**

3        I am employed in the County of Orange, State of California.  I am over the age of 18 and

4    not a party to the within action.  My business address is at BUCHALTER NEMER, A

5    Professional Corporation, 18400 Von Karman Avenue, Suite 800, Irvine, California  92612-0514.

6        On the date set forth below, I served the foregoing document described as:

7    **DECLARATION OF JASON E. GOLDSTEIN IN SUPPORT OF**
     **DFENDANT ARGENT MORTGAGE COMPANY'S EX PARTE**
8    **APPLICATION FOR A STAY OF ALL PROCEEDINGS PENDING**
     **TRANSFER OF ACTION TO MDL 1715**
9

10   on all other parties and/or their attorney(s) of record to this action by placing a true copy thereof

11   in a sealed envelope as follows:

12   Shirley Hochhausen, Esq.
     2117-B University Avenue
13   East Palo Alto, California 94303

14
15
16   ☐    **BY MAIL**    I am readily familiar with the business' practice for collection and processing
17   of correspondence for mailing with the United States Postal Service. The address(es) shown above
     is(are) the same as shown on the envelope.  The envelope was placed for deposit in the United
18   States Postal Service at Buchalter Nemer in Irvine, California on March 18, 2008.  The envelope
19   was sealed and placed for collection and mailing with first-class prepaid postage on this date
     following ordinary business practices.
20
21   ☐    **BY FACSIMILE AND MAIL**    I caused the above-named document(s) to be sent via
     facsimile transmission to the law office(s) and facsimile number(s) stated above.  The
22   transmission was reported as complete and without error.   A copy of the transmission report(s)
     properly issued by one or more of Buchalter, Nemer's three Xerox 745 WorkCenter facsimile
23   machine(s) [telephone number(s): (213) 896-0400, (213) 896-0411, (213) 896-0408], and (213)
     896-0409 is(are) made a part of this proof of service pursuant to CRC §2008.  I am readily
24   familiar with the business' practice for collection and processing of correspondence for mailing
     with the United States Postal Service.  The correspondence will be deposited in an envelope with
25   the United States Postal Service this day in the ordinary course of business for mailing to the
     address(es) shown above.  The envelope was sealed and placed for collection and mailing with the
26   United States Postal Service at Buchalter Nemer in Irvine, California on March 18, 2008
27   following ordinary business practices.

28

BN 1796382v1

/05

1

☒    **BY OVERNIGHT DELIVERY**    On March 18, 2008, I placed the Federal

2

Express/Overnite Express package for overnight delivery in a box or location regularly

maintained by Federal Express/Overnite Express at my office, or I delivered the package to an

3

authorized courier or driver authorized by Federal Express/Overnite Express to receive

4

documents.  The package was placed in a sealed envelope or package designated by Federal

Express/Overnite Express with delivery fees paid or provided for, addressed to the person(s) on

5

whom it is to be served at the address(es) shown above, as last given by that person on any

document filed in the cause; otherwise at that party's place of residence.

6

☐    **BY PERSONAL DELIVERY**    On March 18, 2008, I placed the above-referenced

7

envelope or package in a box or location regularly maintained at my office for our

messenger/courier service or I delivered the envelope or package to a courier or driver authorized

8

by our messenger/courier service to receive documents.  The package was placed in a sealed

9

envelope or package designated by our messenger/courier service with delivery fees paid or

provided for, addressed to the person(s) on whom it is to be personally served at the address(es)

10

shown above as last given by that person on any document filed in the cause.  The

11

messenger/courier service was provided with instructions that the envelope or package be

personally served on the addressee(s) by same day delivery (C.C.P. §1011).

12

☐    I declare under penalty of perjury under the laws of the State of California that the

13

foregoing is true and correct to the best of my knowledge.  Executed on March 18, 2008, at

14

Irvine, California.

15

☒    I declare that I am employed in the office of a member of the bar of this court at whose

16

direction the service was made.  Executed on March 18, 2008, at Irvine, California.

17

18

_____        _____

Laura Urias                                          (Signature)

19

20

21

22

23

24

25

26

27

28