1   Martin D. Murphy (164669)
    Michael E. Hale, Esq. (SBN 245378)
2   LIUZZI, MURPHY & SOLOMON, LLP.
    101 Montgomery Street, 27th Floor
3   San Francisco, CA 94104
4   Tel:  (415) 543-5050
    Fax: (415) 543-3550
5
    COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
6   Shirley Hochhausen (SBN 145619)
7   2117(b) University Avenue
    East Palo Alto, CA 94303
8   Tel: (650) 326-6440
    Attorneys for Plaintiff
9

10                UNITED STATES DISTRICT COURT

11      NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

12

13  RICARDO MARCELOS,                    )   Case No.
                         Plaintiff,      )
                                         )
14                                       )   **OPPOSITION TO DEFENDANT**
              v.                         )   **ARGENT MORTGAGE CO.'S**
15                                       )   **MOTION TO DISMISS**
    EDWIN MAURICIO PARADA DOMINGUEZ,     )
16  GLENDA PARADA, LORENZO PARADA,       )   Date of Hearing: July 17, 2008
    VIKI RAAB, COUNTRYWIDE HOME          )   Time: 8:00 a.m.
17  LOANS, ARGENT MORTGAGE COMPANY,      )   Dept.: Courtroom 9, 450 Golden Gate Ave.
18  LLC, PRIMESTAR FINANCIAL SERVICES,   )   Judge: Honorable William H. Alsup
    SHOAIB MAHMUD, FINANCIAL TITLE       )
19  COMPANY, NEW CENTRUY TITLE           )
    COMPANY, RECONTRUST COMPANY, N.A.    )
20                                       )
21  AND DOES 1 through 100,              )
                         Defendants.     )
22

23                       **INTRODUCTION**

24      In its Motion to Dismiss, Argent has fundamentally misconstrued the legal standards that apply

25  to Motions to Dismiss and has ignored the detailed factual allegations contained in the Complaint.

26                    **FACTUAL BACKGROUND**

27      The crux of this case is simple: Mr. Marcelos, a hard working father of two who is of Mexican

28  descent and who speaks limited English, was preyed upon by Edwin Parada, a mortgage salesman who

1   operated under the license of Primestar Financial Services and Real Estate License holder Shoaib

2   Mahmud. Parada lured Mr. Marcelos into refinancing his home, negotiated the loan in Spanish, gave

3   Mr. Marcelos documents to sign in English, Parada further misrepresented the terms of the loan, gave

4   Mr. Marcelos no loan documents in English or in Spanish and then stole $200,000.00 in loan proceeds.

5   It is doubtful that this type of deception, theft and unlawful conduct would be perpetrated on an English

6   speaking man who was not a minority.

7        Argent was central to this unlawful loan. Were it not for Argent's dereliction of duty the

8   Plaintiff would have had notice of the bait and switch and theft perpetrated by the loan salesman and

9   broker. Argent had an obligation under the Truth in Lending Act (hereinafter "TILA") to deliver

10  mandatory borrower disclosures to the Plaintiff. Argent instead relied on their closing agents, New

11  Century Title Company, to fulfill its responsibility under TILA to provide plaintiff with the disclosures

12  and loan documents. When New Century failed to fulfill Argent's statutory obligations, Argent became

13  liable pursuant to TILA for failure to make the required disclosures. Argent is also liable under RESPA

14  for kickbacks made in derogation of the Real Estate Settlement Procedures Act in the nature of Yield

15  Spread Premiums and other undisclosed payments and liable for violations of California Code Sec 1632

16  which mandates written translations when a contract is negotiated in Spanish. Plaintiff also contends

17  that his race and national origin played a large role in the nature of the loan and that he suffered adverse

18  and disparate treatment at the hands of the defendants in the making and terms of his home loan.

19        Argent later sold the loans which were assigned to Countrywide as a servicer.

20        For these reasons the defendants' Motion to Dismiss fails on all accounts.

21

22  **I.    Plaintiff's Complaint Satisfies the Liberal Federal Pleading Requirements**

23  **A.    Legal Standards**

24        Pleadings in federal court serve a limited role. The complaint is intended solely to notify the

25  defendants of the existence and nature of the plaintiff's grievances. In this regard, "[u]nder the liberal

26  federal pleading policies, a plaintiff need only give defendant fair notice of the claims against it."

27  *Colaprico v. Sun Microsystems, Inc.* (N.D. Cal. 1991), 758 F. Supp. 1335, 1337.

28

1    Because federal pleading rules are so liberal, motions under Rule 12(b)(6) of the Federal Rules

2    of Civil Procedure are strongly disfavored and rarely granted. *Gillian v. Jamaica Dev. Corp.*, 108 F.3d

3    246, 249 (9th Cir. 1997). Indeed, "[a] complaint should not be dismissed for failure to state a claim

4    unless it appears <u>beyond doubt</u> that the plaintiff can prove <u>no set of facts</u> in support of his claim which

5    would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, (1957) (emphasis added).

6    Moreover, dismissal is an "extraordinary" remedy [*United States v. Redwood City* (9th Cir. 1981), 630

7    F.2d 963, 966], only proper "in the unusual case in which a plaintiff includes allegations that show on

8    the face of the complaint that there is some insuperable bar to relief." *Bramlet v. Wilson*, 495 F.2d 714,

9    716 (8th Cir. 1974).

10    In considering a motion to dismiss, the Court: (1) must accept as true all of the factual

11    allegations in the complaint, (2) construe the complaint in the light most favorable to the plaintiff and

12    (3) determine whether any set of facts would entitle the plaintiff to relief. *Leatherman v. Tarrant*

13    *County Narcotics Intelligence and Coordination Unit* (1993) 507 U.S. 163, 164; *see also Cahill v.*

14    *Liberty Mut. Ins. Co.* (9th Cir. 1996) 80 F.3d 336, 337-338.

15

16    **II.    Plaintiff Has Properly and Adequately Alleged Fraud and Deceit.**

17    Federal Rules of Civil Procedure 9(b) states, in pertinent part: In alleging fraud or mistake, a

18    party must state with particularity the circumstances constituting fraud or mistake.

19    Defendant argues that "any misrepresentation...made to plaintiff were by his broker and agent

20    and the Paradas." Argent Motion to Dismiss, pg. 4, line 8. Plaintiff adequately alleges a

21    misrepresentation by Argent, however, in paragraph 66 of his First Amended Complaint (hereinafter

22    "FAC") where he alleges that Argent and New Century, its escrow agent, failed to deliver the loan

23    documents and thereby misrepresented the terms of the loan and plaintiff's rights, including his right to

24    rescind. Defendant Argent attempts to steer the Court away from the clear and undeniable fact that its

25    own escrow Agent, New Century, is the party through whom plaintiff has alleged the misrepresentation

26    in this paragraph. As Argent's clear and undeniable agent who failed to present the documents to

27

28

1   plaintiff[1] and thereby failed to disclose, or misrepresented, the terms of the loan and plaintiff's rights

2   thereto, Argent, too, is liable.

3        Defendant Argent has not disputed any of the other fraud elements and therefore it should be

4   taken that plaintiff properly alleged those as well. Based on the above clarification of the pleadings in

5   opposition to defendant Argent's arguments, plaintiff adequately pleaded fraud with sufficient

6   specificity and defendant's motion to dismiss should be denied.

7

8   **III.**    **Plaintiff Has Properly Alleged Aiding and Abetting Fraud.**

9        The "actual knowledge" prong of the Aiding and Abetting Fraud" cause of action presents a

10   difficult burden to be met by plaintiff and forces him to use discovery to find the "smoking gun" which

11   evidences actual knowledge. Therefore, plaintiff is left to the whim of the defendant to adequately

12   plead the facts necessary to properly allege aiding and abetting fraud. This explains why the cases that

13   deal with this prong invariably involve numerous amendments to the complaints and often end up in the

14   Court of Appeals, including many of those cited by defendant Argent in its Motion to Dismiss.

15        Here, plaintiff has properly alleged aiding and abetting fraud to the extent defendant Argent has

16   complied with discovery orders and presented deponents with knowledge of the transaction at issue. In

17   short, defendant Argent has not provided an adequate opportunity for plaintiff to discover facts that

18   would permit him to plead with the requisite specificity. The deponents presented by Argent were not

19   knowledgeable on the topics that were designated. Admittedly, this is because Argent is now owned

20   and operated by a separate entity than that which was controlling at the time of the transaction at issue.

21   More importantly, however, Argent has refused to produce any emails that would allow plaintiff make

22   a reasonable inquiry into this allegation. Plaintiff has sent out a formal Request for Production of these

23   emails the response to which is not due until July 7, 2008.

24        Of extreme relevance, however, is the discovery that since the filing of the First Amended

25

26   ————————————

[1] New Century's employee, the escrow agent for the loan that is the basis of this lawsuit, testified that she did not hand the

27   loan documents to Mr. Marcelos, which she is required to do by the Truth in Lending Act. *See Exhibit 1.* Ms. Raab also
testified that she did not recall whether Edwin Parada took the documents with him on plaintiff's behalf, but this is irrelevant

28   as the law clearly states that the borrower, not the agent or broker, is to receive the loan documents at closing. *Id.*; *and see*
15 USC §1635(a)(stating that the obligor, i.e. the borrower, must receive the documents).

1     Complaint it appears defendant Argent knew of fraud perpetrated by the Paradas where their escrow

2     agent, Viki Raab, testified she had heard rumors of fraud being conducted by a business where Edwin

3     Parada was working. *See Exhibit 2.* This knowledge is imputed to defendant Argent and would likely

4     suffice as actual knowledge. Of course, with emails or other correspondence evidencing this in

5     document form, this would certainly suffice as actual knowledge.

6         Even if this knowledge is not deemed imputed from New Century to Argent through their

7     agency relationship, it seems likely that defendant Argent, too, would be aware of the same rumors of

8     fraud being perpetrated by the Paradas by nature of being a player in the same market. If given the

9     opportunity to review the emails and correspondence requested plaintiff will be able to determine

10    whether Argent had actual knowledge sufficient to meet his burden.

11        Furthermore, defendant Argent has not adequately shown that plaintiff did not allege actual

12    intent where it argues plaintiff's and defendant Mahmud's deposition testimony is contrary to the First

13    Amended Complaint's allegations. Defendant Argent states that these depositions together prove that

14    Argent did not enfranchise or know that Primestar, its employees and Edwin Parada were using its

15    goodwill and name in a fraudulent scheme. *See* Argent's Motion to Dismiss, page 7, lines 14.5-18.5. A

16    careful reading of these depositions will show, however, that defendant Mahmud admits that he

17    conducts business with Argent and plaintiff never states that he did not rely on the presence of Argent

18    and others in trusting Edwin Parada when he agreed to the transaction. *See* Argent's Request for

19    Judicial Notice Exhibits 2 and 3. In fact, defendant Mahmud does nothing more than say he was not

20    affiliated with Argent. Plaintiff does nothing more than say he was not aware of Argent's reputation,

21    but he trusted Parada who said he had lenders and others he was working with, a fact which lured him

22    into the deal. None of this can be read to state or imply that Argent did not enfranchise or know that

23    Primestar, its employees and Parada were using its goodwill and name to steal from people like

24    plaintiff.

25        As to the second prong requiring substantial assistance, defendant Argent does not, nor could it,

26    deny that it substantially assisted the fraud where it funded the loan at issue.

27        Defendant Argent's arguments regarding Aiding and Abetting a Breach of Fiduciary Duty is

28    poorly placed as plaintiff did not plead this cause of action but rather pleaded Aiding and Abetting

1  Fraud, a similar and related, though by no means identical, cause of action. As a result, defendant's

2  lengthy and confusing argument is entirely inapplicable here as plaintiff.

3      Based on the newly discovered facts regarding Argent's imputed knowledge of fraud being

4  perpetrated by the Paradas and the poor factual arguments presented by defendant Argent, plaintiff

5  respectfully requests Argent's Motion to Dismiss be denied. In the alternative, based on the pending

6  discovery in this matter as well as the recently discovered facts, plaintiff respectfully requests leave to

7  amend.

8

9  **IV.    Plaintiff Has Properly Alleged a Cause of Action Under The Unfair Business and Practices**

10  **Act.**

11      The Unfair Business and Practices Act, or §17200 of the California Business and Professions

12  Code (hereinafter "UBPA") defines unfair competition as "any unlawful, unfair or fraudulent business

13  act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by…

14  §17500." Bus. & Prof. Code §17200. "The (UBPA's) scope is broad. By defining unfair competition

15  to include any 'unlawful…business or practice' [citation], the UBPA permits violations of other laws to

16  be treated as unfair competition that is independently actionable. [Citation.]" *Kasky v. Nike, Inc.* (2002)

17  27 Cal. 4th 939 at 949. "An 'unlawful' business activity includes '"anything that can be properly called

18  a business practice and that at the same time is forbidden by law." [Citation.]' Virtually any law –

19  federal, state or local – can serve as a predicate for an action under…§17200. [Citation.]" *Smith v.*

20  *State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal. App. 4th 700, 717-718. Thus, violations of

21  federal law will form the predicate unlawful business practice necessary to bring a claim under the

22  UBPA. *Washington Mutual Bank v. Superior Court* (1999) 75 Cal. App. 4th 733, 787 [violation of

23  disclosure requirements in RESPA is unlawful practice under UBPA].

24      Plaintiff has already previously adequately alleged violations of TILA to which defendant

25  Argent did not here move to dismiss. A violation of this federal act would support an allegation of

26  §17200 on its own. Plaintiff also previously adequately alleged a violation of Cal. Civil Code §1632,

27  which was not included in defendant's current motion to dismiss. This, too, would suffice to permit a

28  §17200 claim. Furthermore, as argued above, plaintiff adequately pleaded fraud and aiding abetting

1  fraud.  Should the Court agree plaintiff properly alleged violations of either fraud or aiding and abetting
2  fraud, §17200 would therefore also apply.

3       With regard to fraud, case law is abundantly clear that the term "fraudulent" in section 17200
4  "only requires a showing that members of the public are likely to be deceived." *Saunders* v. *Superior*
5  *Court* (1994) 27 Cal. App. 4th 832, 839 (*citing Bank of the West v. Superior Court* (1994) 2 Cal. 4th
6  1254, 1267).  This level of specificity surely has been met where defendant is a national mortgage
7  company who deals with thousands of potential borrowers and/or their agents on a daily basis.  Clearly,
8  where plaintiff has alleged fraud defendant's role implicates a likelihood that other members of the
9  public, especially predominately Spanish-speaking members, are likely to be deceived by defendants,
10  their agents, employees or assigns.

11       Section 17200 of the UBPA is adequately pled in relation to causes of action not at issue in this
12  Motion to Dismiss and therefore cannot be stricken from the First Amended Complaint.  Even if the
13  Court were not to find this compelling, plaintiff has properly alleged fraud and aiding and abetting
14  fraud such that each, on their own, would form the predicate unlawful business practice necessary to
15  bring a claim under the UBPA.  Defendant's motion to dismiss should be denied.

16

17  **V.    Punitive Damages Are Recoverable in Fraud Actions.**

18       Section 3942(a) of the California Code of Civil Procedure states, in pertinent part, that in an
19  action for the breach of an obligation not arising from contract, where it is proven by clear and
20  convincing evidence that the defendant has been guilty of fraud, the plaintiff, in addition to the actual
21  damages, may recover damages for the sake of example and by way of punishing the defendant.
22  Section 3942(c)(3) of the same Code defines fraud as an intentional misrepresentation, deceit, or
23  concealment of a material fact known to the defendant with the intention...depriving a person of
24  property or legal rights or otherwise causing injury.  Case law is also well established on this point: The
25  court may award punitive damages in an action for breach of an obligation not arising from a contract if
26  the plaintiff proves by clear and convincing evidence that the defendant's conduct was fraudulent. CC
27  §3294(a); *Pat Rose Assocs. v Coombe* (1990) 225 CA3d 9, 21, 275 CR 1, disapproved on other grounds
28  in *Adams v Murakami* (1991) 54 C3d 105, 116, 284 CR 318; *Storage Servs. v Oosterbaan* (1989) 214

1 | CA3d 498, 514, 262 CR 689.

2 | As with section 17200, argued above, defendant Argent has not moved to dismiss §1632 or

3 | TILA, which would both provide grounds for punitive damages. The properly pleaded fraud and aiding

4 | and abetting fraud will also provide grounds for punitive damages.

5 | Defendant Argent's Motion to Dismiss should be denied.

6 |

7 | **CONCLUSION**

8 | For the foregoing reasons, plaintiff respectfully requests that the Court deny the motion to

9 | dismiss complaint. In the event that the Court finds the motion to dismiss to any cause of action is

10 | proper, plaintiff respectfully requests that the Court specify the grounds upon which the ruling is based

11 | and grant plaintiff leave to amend his complaint to cure any defects. In the event the Court finds that

12 | such defects cannot be cured, plaintiff respectfully requests that the Court grant leave to amend to

13 | allege that the defendant bringing this motion to dismiss is properly joined as a necessary party since in

14 | this defendant's absence the Court cannot afford complete relief between the parties.

15 |

16 | Dated: June 26, 2008                                    LIUZZI, MURPHY & SOLOMON, LLP.

17 |

18 | By: _____

19 | Michael E. Hale
Attorney for Plaintiff

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# EXHIBIT 1

Raab Depo ROUGH

00001
```
 1              ROUGH DRAFT DISCLAIMER
 2
 3        The following is an unedited rough draft
 4   transcript.  Various corrections and/or changes may be
 5   made before the final version is complete.  The use of
 6   this rough draft transcript is limited by C.C.P. §
 7   2025.540(b).  This reporter, as well as any affiliated
 8   court reporting agency, will not be responsible for
 9   any variance of this draft from the final transcript.
10
11        This real-time uncertified and unedited transcript
12   contains no appearance page, index, or certificate.
13
14                   VICKI LINN RAAB,
15            having first been duly sworn by the
16        Certified Shorthand Reporter, was examined
17                 and testified as follows:
18
19                     EXAMINATION
20   BY MR. MURPHY:
21   Q.          Hi.  Can you state your full name for the
22   record, please.
23   A.          Vicki Linn Raab.
24   Q.          Can you spell your last name, please.
25   A.          R-a-a-b.
```

00002
```
 1   Q.          Ms. Raab, we introduced ourselves prior.  My
 2   name is Martin Murphy.  I'm representing
 3   Ricardo Marcelos in the lawsuit we're here for today.
 4               Have you ever had your deposition taken
 5   before?
 6   A.          Yes.
 7   Q.          Okay.  Approximately how many occasions?
 8   A.          Twice.
 9   Q.          When was the last time your deposition was
10   taken?
11   A.          Approximately ten years ago.
12   Q.          All right.  And, if you recall, what was the
13   issue for your deposition?
14   A.          A mortgage broker dispute; elderly gentleman
15   was the borrower.
16   Q.          So that had to do with your business?
17   A.          Yes.
18   Q.          Okay.  Were you a defendant in that action?
19   A.          No.  Were you a party at all in that action?
20   Q.          Were you a party at all in that action?
21   A.          No, sir.
22   Q.          Was your deposition taken as a witness?
23   A.          I believe, yes.
24   Q.          Since it's been a long time, I'll give you
25   some ground rules for the deposition here today.  I'm
```

00003
```
 1   sure you had a chance to talk to counsel and go over
 2   the deposition process, but I will give a few ground
 3   rules here today to make it go more smoothly.  Okay?
 4   A.          Okay.
 5   Q.          First and foremost, you are here testifying
 6   under penalty of perjury; so you're under a duty to
 7   tell the truth to the best of your ability.  Do you
 8   understand that?
```

Page 1

Raab Depo ROUGH
```
 9   A.        It is.
10   Q.        And you filled this out when you looked at
11   Mr. Marcelos's driver's license?
12   A.        Yes.  I believe I took a copy and filled it
13   out based on the copy right after -- this is his
14   driver's license.
15   Q.        Is this part of your duties as a notary?
16   A.        No, closing agent.
17             MS. KATZ:  And just so the record is clear,
18   you were referring to the next document, 150.
19             THE WITNESS:  Yes, 150.
20   BY MR. MURPHY:
21   Q.        Right.  So all the handwritten words on 149
22   are your writing?
23   A.        Yes.
24   Q.        Okay.  If you go to NC 157, "Data integrity
25   audit," do you see that?
```
00151
```
 1   A.        Yes.
 2   Q.        Who fills out this document?
 3   A.        I assume Argent did.
 4   Q.        This is a document that the escrow officer
 5   would receive from the lender?
 6   A.        I've never seen one like this before.  It
 7   could be just one of the mishmash documents that kind
 8   of gets stuck in their package.  It looks almost like
 9   it's the loan commitment as to what the monthly
10   payments are, the terms of the loan, the margin.
11   Q.        But this is a document that's filled out, as
12   far as you know, by Argent?
13   A.        Yes.
14   Q.        All right.  If you go to NC 159, what is
15   this document? ·
16   A.        Well, the top part -- again, I'm just
17   telling you how I'm interpreting it because it's not
18   my document.
19   Q.        Right.
20   A.        Just reiterating that any oral agreements,
21   no matter who you made them with, are not binding; it
22   has to be in writing.  And then down below, they're
23   just trying to verify that they have a complete
24   understanding of the loan terms, the loan documents,
25   and that you received a full set.
```
00152
```
 1   Q.        Right.  Okay.  So we know No. 2 you're not
 2   sure if that happened -- correct? -- we've already
 3   talked about that?
 4             MS. KATZ:  Just objection.  I don't know if
 5   that was her testimony.  I think you might be
 6   mischaracterizing her testimony.
 7   BY MR. MURPHY:
 8   Q.        Number 2 underneath it says:  "You have
 9   received a full and complete set of all loan documents
10   you have signed with this transaction including a copy
11   of this notice."
12             I think we've previously talked about that
13   you, as the escrow officer, don't know, as you sit
14   here today, whether Mr. Marcelos received that.
15   Correct?
16   A.        I did not hand him the copies; I made his
17   copies for him.
```
Page 65

Raab Depo ROUGH

18   Q.         Right.  Okay.  But you don't know if he
19   walked out the door with those copies?
20   A.         I don't know that he didn't either.
21   Q.         Right.  You don't know one way or the other?
22   A.         Correct.
23   Q.         Number 1 says:  "You've been given an
24   opportunity to read your loan documents, have read
25   them and fully understand the terms of this loan

00153
 1   transaction."  Do you see that?
 2   A.         Yes.
 3   Q.         Do you have any responsibility as the escrow
 4   officer to make sure that the borrower has read these
 5   documents before signing this document?
 6   A.            No.  This came from Argent.
 7   Q.         Do you have any responsibility as a notary
 8   to make sure Mr. Marcelos has read these documents
 9   before he signed the document?
10   A.         No.
11   Q.         NC 163, do you see this document?
12   A.         Yes.
13   Q.         What is this document?
14   A.         This is a name affidavit -- signature
15   affidavit.
16   Q.         And what is that?
17   A.         This gives the borrower an opportunity to
18   let the lender know if he has any other aliases.  And
19   a lot of times this document comes already completed
20   when the lender gets the credit report.  My credit
21   could be under "Viki Linn," "Viki L."  And so it would
22   come on there saying that "Viki Linn" is also known as
23   "Viki L."
24              In this case it was blank.  And so that the
25   way this was executed, when I was checking signatures,

00154
 1   I would have had Mr. Marcelos write his name here that
 2   he was known as "Ricardo H. Marcelos" next to his
 3   signature, and then I notarized it.
 4   Q.         So that was the purpose was to figure out if
 5   he had other names that he went by?
 6   A.         Yeah.  And, again, in my opinion, this form
 7   is not even completed because it's "H."  He should
 8   have had the "Ricardo Hernandez" on here.  But it's an
 9   Argent form so -- and they funded with it; so they
10   were satisfied with the contents.
11   Q.         All right.  So even though Mr. Marcelos did
12   not sign or initial at least a majority of these
13   documents in front of you, would it be your practice
14   to look at the signatures and initials and verify that
15   it appears to be his writings?
16   A.         The notary documents.  You know, in his
17   case, as he's standing in front of me and I'm flipping
18   through the papers, there would have been nothing to
19   make me even think he hadn't executed these documents.
20   He's watching me, you know, see his signature or his
21   name with a signature.  It never would have even
22   occurred to me that there was a problem with it.
23              MR. MURPHY:  Okay.  We can take a break now.
24              (Whereupon, a recess was taken from
25               3:05 p.m. to 3:17 p.m.)

# EXHIBIT 2

Raab Depo ROUGH

```
 9   Q.          And, if you know, approximately how many
10   loans did New Century have that involved Primestar?
11   A.          I can't answer that.
12   Q.          How about with Edwin Parada?
13   A.          Again, I guessed, I think, 20, 25
14   transactions with ERA.  But I couldn't designate how
15   many of those were Edwin's.
16   Q.          Have you ever of had Glenda Parada?
17   A.          I've seen her name in the documents relative
18   to this.
19   Q.          Aside from the documents, have you ever
20   heard of Glenda Parada or have you ever spoken with
21   Glenda Parada?
22   A.          No.
23   Q.          How about Humberto Covurrusias?
24   A.          No.
25   Q.          And I believe you said that your contact at
```

00165
```
 1   Primestar was Christian Covurrusias?
 2   A.          Chris.
 3   Q.          Chris.  I'm sorry.
 4               When was your last conversation with Chris,
 5   telephonic, personal, any conversations?
 6   A.          I have no idea.  It would have been the last
 7   transaction I closed that he was involved with because
 8   we didn't talk aside from transactions.
 9   Q.          So would you say that would be a couple
10   years ago?
11   A.          At least.  Three to four years ago, maybe.
12   Q.          And you've been in the -- I'll say the
13   escrow industry for approximately how long?
14   A.          Over 30 years.
15   Q.          And all that time was in the Bay Area; is
16   that correct?
17   A.          Correct.
18   Q.          Did you -- this may be vague.  Did you ever
19   hear of Parada's name in the industry and hear
20   anything negative about him?
21               MS. KATZ:  I am just going to object that's
22   a bit of a confusing question.  Maybe a time frame
23   or --
24               MR. LIU:  Okay.  Let's say --
25               MS. KATZ:  I'm saying it's a very broad,
```

00166
```
 1   very open-ended question.
 2   BY MR. LIU:
 3   Q.          Let's say 2005 until the time you stopped
 4   doing escrow services, have you at any time during
 5   that time period heard anything negative about
 6   Edwin Parada?
 7   A.          Can we come back to that question?
 8               MS. KATZ:  You have to answer the question.
 9               THE WITNESS:  Right now, I do?
10               MS. KATZ:  Are you unclear on the question?
11               THE WITNESS:  No, I'm unclear as to pulling
12   Edwin out of the whole ERA scenario.  There was a lot
13   of confusion, a lot of not nice things happening
14   within the office Edwin was in.  And so I'm not
15   certain if the things I heard about included Edwin or
16   not.  I couldn't just --
17   BY MR. LIU:
```

Page 71

Raab Depo ROUGH

```
18   Q.           Right.  So the negative things you may have
19   heard about Edwin, you're saying are related to his
20   employment at ERA?
21   A.           There were a lot of soap opera type antics
22   that were going on within that office.
23   Q.           What about any gossip or rumors about fraud
24   committed by anyone in the ERA office?
25   A.           The broker.  I had heard a rumor about the
```

00167
```
 1   broker of the office.
 2   Q.           What was his or her name?
 3   A.           Tony Navarro.
 4   Q.           But nothing -- but you heard no, like,
 5   rumors or gossip about Parada individually about any
 6   fraud he may have committed or allegedly committed?
 7   A.           No.
 8   Q.           And for the Marcelos loan, it looks like the
 9   only documents that you notarized was the deed of
10   trust and the signature affidavit?
11   A.           Okay.
12   Q.           Were there any other documents?
13   A.           I don't believe so.  I think those are the
14   only ones that I see here.
15   Q.           Typically would those be the only documents
16   you would notarize?
17   A.           There could be some other type of
18   affidavits.  It just depends on the lender and what
19   their package looks like.
20   Q.           And I believe you said that you're currently
21   unemployed?
22   A.           That's correct.
23   Q.           And you're in school?
24   A.           That's correct.
25   Q.           And what program -- what school are you at?
```

00168
```
 1   A.           It's called Spectrum Community Services.
 2   Q.           And what type of degree or --
 3   A.           Business applications.
 4   Q.           And when do you expect to graduate from
 5   that?
 6   A.           I believe the course completes in January;
 7   it's just a 12-month.
 8   Q.           And you have not turned in your notary stamp
 9   back to the California Secretary of State?
10   A.           No.  I don't have to; it's mine.
11   Q.           Okay.  Let's take a look at the first
12   amended complaint.  And I don't want to use this as an
13   exhibit, I guess in spirit of not putting paper here.
14   But I'll represent that this is the first amended
15   complaint filed by Ricardo Marcelos.  Just to be
16   clear, Argent and Countrywide did not prepare this
17   document.  This was prepared by the plaintiff who is
18   suing New Century and Argent and Countrywide.  Okay?
19   A.           Uh-huh.
20                MS. KATZ:  (Gesturing.)
21                THE WITNESS:  Yes.
22   BY MR. LIU:
23   Q.           Now, if we can go to page 7 to paragraph 34,
24   and in the left-hand column are numbers.  Do you see
25   those, it goes, like, from 1 to 28?
```

Page 72